934 So.2d 1128 (2006)
Michael Gordon REYNOLDS, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-1919.
Supreme Court of Florida.
May 18, 2006.
Rehearing Denied July 11, 2006.
*1134 James S. Purdy, Public Defender, and James R. Wulchak, Chief, Appellate Division, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We have on appeal a judgment of conviction of two counts of first-degree murder and corresponding sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and sentences of death.

I. FACTS AND PROCEDURAL HISTORY
The circumstances surrounding the crimes involved in this matter and the *1135 nature of the physical evidence cause the facts established at trial to be crucial in our analysis of this case. Specifically, we note that physical evidence produced at trial placing Reynolds at the scene of the crimes, inconsistencies in Reynolds' statements to the authorities regarding injuries he sustained on the evening the murders were committed, and evidence tending to establish his involvement in the murders are all important to our decision to affirm Reynolds' convictions and sentence. On August 25, 1998, the grand jury indicted the appellant, Michael Gordon Reynolds, on three counts of first-degree premeditated murder for the murders of Danny Ray Privett, Robin Razor, and Christina Razor, and for the burglary of a dwelling during which a battery upon Robin or Christina or both was committed while armed with a weapon. On July 22, 1998, the bodies of the victims were found on the property located at 1628 Clekk Circle in Geneva, Florida. Danny's body was found outside near a large pine tree, and the bodies of Robin and Christina were found inside a trailer in which the victims were living. The trial in this case began on April 21, 2003, and on May 7, 2003, Reynolds was found guilty of the lesser-included offense of second-degree murder as to the murder of Danny, and guilty as charged as to the remaining three counts of the four-count indictment.
The evidence established that on July 22, 1998, Shirley Razor, the mother of victim Robin Razor, traveled to the crime scene to deliver items Danny used in the work he was doing on trailers at that location. Upon arriving at the property, Shirley noticed Danny lying on the ground outside. Shirley, being accustomed to seeing Danny drunk and passed out, proceeded to her separate trailer on the property and ate her lunch. After finishing her lunch, Shirley walked over to the trailer in which Danny and Robin were living when she noticed that Danny had a "hole in his head." After discovering that Danny was dead, Shirley ran to a neighbor's residence and called the authorities. Subsequent to the arrival of the fire department personnel, Shirley went to her daughter's trailer and upon looking inside found that her daughter, Robin, and her granddaughter, Christina, were inside and apparently dead.
At trial, a medical examiner, Dr. Sara Hyatt Irrgang, testified that the deaths had occurred at least eight hours, but probably more than twelve hours prior to her arrival at the crime scene, placing the time of death between nine p.m. on July 21 and seven a.m. on the morning of July 22. The evidence demonstrated that Danny Ray Privett was found lying outside beneath a large pine tree on his side with his face down, surrounded by bloody pieces of concrete block and broken pieces of glass. Danny's jeans were partially unzipped suggesting that he had been in the process of urinating when the attack occurred. The autopsy of Danny Ray Privett revealed that he suffered a large depressed skull fracture with additional injuries to the head area. The wounds appeared to have been caused by three or more separate blows, with the injuries indicating that the assailant had been behind the victim. There was no indication of any defensive wounds on Danny, and examination of his major skull injury revealed that the injury was likely caused by a partially broken cinder block, based on fragments found within the wound. The medical examiner was unable to determine the order in which the injuries had been inflicted upon him. The cause of death for Danny was determined to be primarily due to blunt force trauma to the head with the large *1136 depressed skull fracture probably being the fatal blow. If this blow had been inflicted first, the medical examiner opined that the victim would have lost consciousness within a second to a minute or two.
Robin and Christina Razor were found dead inside the living room portion of the camper trailer being used as living quarters. Robin was found lying on the floor, face up. Christina was found nearby sitting on the couch and leaning to her left. The living room area was in disarray and a large amount of blood was scattered throughout this area of the trailer. Robin Razor's autopsy revealed that she suffered multiple stab wounds along with multiple blows to the side of her face and a broken neck resulting in injuries to her spinal cord. Closer examination revealed that Robin suffered ten stab wounds to the head and neck area and one to the torso area. The wounds appeared to have been inflicted with a sharp object such as a knife or scissors. Based on examination of the Robin's body and the defensive wounds present, the medical examiner opined that she had been involved in a violent struggle. In addition to the above wounds, Robin suffered multiple superficial wounds to her torso area which the medical examiner stated to be consistent with torment woundswounds produced not to cause serious injury but to cause aggravation and produce fear in the victim. The medical examiner was of the opinion that because blows to the victim's head were inflicted at different angles and the presence of significant defensive wounds, it was likely that she was conscious and struggling when these wounds were inflicted. The primary cause of death for Robin was determined to be the broken neck and spinal cord injury, although bleeding from the stab wounds would have also resulted in death.
The autopsy of Christina Razor revealed that she suffered blunt force trauma to her head, a stab wound to the base of her neck that pierced her heart, and another stab wound to her right shoulder that pierced her lung and lacerated her pulmonary artery. These latter two wounds would have resulted in significant internal and external hemorrhaging and would have been fatal. The medical examiner indicated that the only sign of defense wounds to Christina was the presence of a small contusion to her left hand, which could have occurred as she attempted to block a blow from her assailant. The medical examiner opined that Christina would have lost consciousness within a minute or two of receiving the stab wounds. The primary cause of death for Christina was determined to be internal and external hemorrhaging.
During his investigation of the crimes, Investigator John Parker of the Seminole County Sheriff's Department made contact with Reynolds and requested that he submit to an interview, to which Reynolds voluntarily agreed. During this interview, Investigator Parker also inquired about injuries that he observed on Reynolds' hand and ankle. In response to inquiries made about these injuries, Reynolds advised the investigator that at approximately five a.m. on the morning that the victims' bodies were discovered, he was taking his dog outside and slipped on the exterior step of his camper, twisting his ankle. Reynolds stated that the cut on his hand occurred when he caught his hand on a burr on the aluminum door frame of his trailer as he attempted to break his fall by grabbing the door frame. Reynolds advised the investigator that approximately thirty or forty minutes after sustaining the injuries he cleaned the cut to his hand and proceeded to an emergency *1137 room for treatment. Reynolds stated that while on his way to the emergency room he suffered a flat tire and borrowed a jack from a convenience store to change his tire and after doing so he proceeded to the emergency room. After receiving treatment for his injuries, Reynolds informed the investigator that he returned to his residence and removed the burr from the trailer door frame with a pair of channel-lock pliers.
In addition to the discussion concerning the injury, Reynolds also discussed an altercation in which he was involved with Danny Ray Privett regarding a trailer that was allegedly given to Reynolds by his landlord. According to Reynolds, the argument with Danny was centered upon Danny removing the trailer from Reynolds' property without permission. Upon discovering that Danny had removed the trailer, Reynolds indicated that he confronted Danny and a heated argument ensued. Reynolds stated that after exchanging words with Danny, he left Danny's property but returned a short while later to apologize and advise Danny that he could keep the trailer. Significantly, during this interview Reynolds advised the investigator that he had never been inside the trailer in which the victims were living. Subsequent to this interview, Reynolds gave permission for the search of both his trailer and his vehicle, and he also agreed to provide hair and blood samples for DNA analysis. Additionally, pursuant to a search warrant certain evidence was seized from Reynolds' vehicle and residence.
At trial, a neighbor of the victims testified that on the night prior to the discovery of the bodies he observed a car similar to that of Reynolds parked at the victims' residence. Fingerprint and shoe pattern analysis of the crime scene and items collected from the scene revealed several prints of value, but none of them connected Reynolds to the scene. However, extensive evidence with regard to DNA analysis resulting from testing of items of evidence recovered from the crime scene was presented. Several of the items recovered from the crime scene inside the trailer and on the exterior of the trailer contained a DNA profile matching that of Reynolds. There was no eyewitness testimony offered by the State and, other than the concrete block allegedly used to strike the victims, no other weapon was recovered.
The defense attempted to establish mishandling and contamination of the evidence, along with suggesting that other individuals had committed the crimes with which Reynolds had been charged. The defense elicited testimony from Danielle Privett, Danny and Robin's other daughter, indicating that her parents had been having an ongoing disagreement regarding rent payments with a man by the name of Justin Pratt, a friend of Pratt's, Alan Combs, and Pratt's girlfriend, Nicole Edwards. In addition to this testimony, Reynolds presented evidence consisting of portions of an interview conducted by the Sheriff's Department with Pratt wherein Pratt discussed the disagreement and admitted that he had left a note at the victims' residence indicating that "it was war,. . . conventional weapons." After hearing all the evidence, the jury rendered a verdict finding Reynolds guilty of second-degree murder as to the death of Danny Privett, two counts of first-degree murder as to the deaths of Robin and Christina Razor, and burglary of a dwelling during which a battery was committed while Reynolds was armed with a weapon.
During the penalty phase the State presented four witnesses. Danna Birks established *1138 multiple prior convictions of Reynolds. Tonya Chapple, the victim of Reynolds' prior conviction for aggravated battery, described the circumstances surrounding the prior crime. Christina Razor's grandmother testified as to Christina's age at the time of the crimes, and Robin Razor's brother read a prepared statement in the nature of victim impact evidence. Reynolds, after thorough consultation with his attorneys and the trial court, waived his right to present mitigating evidence.
On May 9, 2003, the jury returned unanimous recommendations of death for both first-degree murder convictions. During the Spencer[1] hearing, the sole testimony presented by the defense was the testimony of Reynolds himself. The State did not present any testimony, relying solely on the evidence and testimony admitted during the guilt and penalty phase trials as support for the aggravating factors. At sentencing, the State presented testimony of Teresa Barcia, the sister of Danny Ray Privett, who read a prepared statement expressing the pain caused by the victims' death and asking the court to impose the maximum sentence provided by law. On September 19, 2003, the trial judge sentenced Reynolds to concurrent sentences of life for the murder of Danny Ray Privett and the burglary conviction, and the trial judge entered separate sentences of death for the murders of Robin and Christina Razor. In pronouncing Reynolds' sentence, the trial court found that the State had proven beyond a reasonable doubt the existence of four statutory aggravators for the murder of Robin Razor: (1) Reynolds had previously been convicted of a another capital felony or a felony involving a threat of violence to the person (great weight); (2) Reynolds committed the murder while he was engaged in or was an accomplice in the commission of or an attempt to commit a burglary of a dwelling (great weight); (3) the murder was committed for the purpose of avoiding a lawful arrest (great weight); and (4) the murder was committed in an especially heinous, atrocious, or cruel fashion (great weight).
As to Christina Razor's murder, the trial court found that the State had proven beyond a reasonable doubt the existence of five statutory aggravators: (1) Reynolds had previously been convicted of a another capital felony or a felony involving a threat of violence to the person (great weight); (2) Reynolds committed the murder while he was engaged in or was an accomplice in the commission of or an attempt to commit a burglary of a dwelling (great weight); (3) the murder was committed for the purpose of avoiding a lawful arrest (great weight); (4) the murder was committed in an especially heinous, atrocious, or cruel fashion (great weight); and (5) the victim of the murder was a person less than twelve years of age (great weight).
In its analysis of the mitigation present, the trial court acknowledged the defendant's waiver of the presentation of mitigating evidence but, nonetheless, the court considered and weighed any mitigation that it found to be established. In doing so, the trial court found that the following nonstatutory mitigating circumstances had been established and were applicable to both the murders of Robin and Christina Razor: (1) that Reynolds was gainfully employed at the time of the crimes (little weight); (2) that Reynolds manifested appropriate courtroom behavior throughout *1139 the proceedings (little weight); (3) that Reynolds cooperated with law enforcement (little weight); and (4) that Reynolds had a difficult childhood (little weight). The trial court determined that the evidence did not establish that Reynolds could easily adjust to prison life. The trial court recognized that evidence was presented by Reynolds for purposes of establishing lingering doubt. However, the trial court noted that it would not consider any theory of lingering doubt as nonstatutory mitigation in its sentencing analysis. This direct appeal followed.

II. ANALYSIS

A. Statement of Justin Pratt
Subsequent to the discovery of the victims, investigators spoke with Danielle Privett, the oldest daughter of Danny Ray Privett and Robin Razor, who informed the authorities that her parents had been having problems with Justin Pratt with regard to asserted unpaid rent owed by the family to Pratt. As a result of this discussion with Danielle, Deputy Ray Parker interviewed Pratt on July 23, 1998, in connection with his investigation of the crimes. During trial, Reynolds attempted to secure the testimony of Pratt, who was in Oklahoma, in an effort to demonstrate the animosity existing between Pratt and the victims, but the defense investigator was unable to obtain his attendance for trial. Due to this inability, Reynolds' trial counsel attempted to place into evidence at trial the transcript of Pratt's July 23 interview with law enforcement officers based on an argument that the interview fell within the statement against interest exception to the hearsay rule. After consideration of arguments from both sides regarding the admissibility of the statement from the interview, the trial judge ruled that Pratt was unavailable and that limited portions of the interview were admissible under the statement against interest exception rule of evidence, while the remainder of the interview was inadmissible hearsay.
Florida law defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (2003). Hearsay is inadmissible at trial except as specifically provide by statute. See § 90.802, Fla. Stat. (2003). Section 90.804 of the Florida Statutes (2003) provides an exception to the hearsay rule of inadmissibility for out-of-court statements offered for the truth of the matter asserted made by an unavailable witness if the statement qualifies as a "statement against interest." See § 90.804(2)(c), Fla. Stat. (2003). The definition of that which qualifies as a statement against interest in its entirety provides:
A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
Id. Reynolds contends (a) that the trial court erred when it found that the excluded portions of Justin Pratt's interview with investigators were hearsay, and (b) even if the excluded portions were properly considered hearsay, the trial court erred by *1140 finding that they did not come within the statement against interest exception to the hearsay rule of inadmissibility.
As to the first assertionthat the statements were not hearsayReynolds contends that Pratt's interview statements regarding the manner in which the victims were killed and the statements regarding Pratt's location at the time of the crimes were not being offered for their truth. Initially, we note that the only portion of Pratt's statement that Reynolds asserted was not hearsay were the statements that Danny Ray Privett himself stabbed Robin and Christina. Reynolds' contention that the statements regarding the location of Pratt at the time of the crime were not hearsay was not presented to the trial court, and, therefore, this issue has not been properly preserved for review by this Court. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below."). During the discussion of these location statements at trial, Reynolds' trial counsel specifically stated to the trial judge that he wanted those statements admitted because they were directed
to [the defense] position ... that [Pratt] had motive, opportunity and time to commit these crimes and that ... this is the other person that we're going to allege that he committed it with.... [H]e is telling that, in fact, he, in fact, met this person on the night of the killings and what time he met them.
Based on these arguments advanced by Reynolds' trial counsel, it is clear that the statements regarding the location of Pratt at the time of the crime were in fact being offered by Reynolds for their truth and nothing to the contrary was argued by the defense at trial. Therefore, the trial court properly found these statements to be hearsay subject to the rule of inadmissibility, see § 90.801(1)(c), Fla. Stat. (2003), and any claim by Reynolds that these statements were not being offered for their truth and, therefore, were not hearsay has not been properly preserved for our review. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982).
As to the statements by Pratt regarding the manner of death, Reynolds asserts that these statements were not being admitted for their truth but, rather, the defense sought to admit them to demonstrate that Pratt knew the manner in which the victims were killed, a fact that Reynolds claims had not been released to the public at the time of Pratt's interview. Initially, we note that these statements, offered without explanation, undoubtedly constitute hearsay. In fact, these statements, which involve Pratt relaying to law enforcement officers what another individual told him, qualify as inadmissible hearsay within hearsay. However, notwithstanding the foregoing, a close review of the trial transcript reveals that these statements may in fact have been incorrectly determined to be hearsay by the trial court. During the discussions of these particular statements, Reynolds' trial counsel stated, "[W]e're not trying to prove that that statement is, in fact, true.... As a matter of fact, that particular statement.... We know that not to be true. It's not a true statement nor are we offering it for the truth of the matter asserted." Based on the foregoing, it is clear that the statements were not being offered to establish their truth, and, therefore, we conclude that the trial court improperly concluded that they were subject to the hearsay rule of inadmissibility. See *1141 Foster v. State, 778 So.2d 906, 914-15 (Fla. 2000) ("A statement may . . . be offered to prove a variety of things besides its truth. A statement may be offered, for instance, to show motive, knowledge, or identity.") (citations omitted). However, given this conclusion, we must still determine whether this error requires reversal of Reynolds' convictions or merely constitutes harmless error. Error is considered harmless only when there is no reasonable possibility that the error contributed to the conviction. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Based on the analysis outlined below, we conclude that the trial court's ruling that these statements were inadmissible hearsay was harmless error, and, therefore, this determination does not require reversal of the convictions.
The material excluded portions of Pratt's interview in this claim reveal:
Pratt, J: ... Debbie [Pretena] came in and told me that ... what she had heard and she heard about the, what I was telling you earlier, about the. . .
Parker, R: Debbie is Nicole's friend?
Pratt, J: Yeah.
....
Parker, R: What did she say?
Pratt, J: She said that Danny had cut, stabbed or whatever, Robin and Chris....
....
Herron, L: But she said specifically that Nicole had told her that Danny had cut...
Pratt, J: That's what she thought, yeah. That's what....
Reynolds asserts that because these statements establish Pratt's involvement in the crimes due to his knowledge of the manner of death, a fact that had not been released to the public at the time of the interview, the statements went to the heart of his defensethat Pratt committed the crimesand, therefore, the error was not harmless. Although the trial court did rule that the statements were inadmissible, the defense was permitted to place into evidence portions of Pratt's interview in which he discussed an argument between himself and the victim Danny Privett, along with admissions by Pratt that he had left a note at the victims' residence declaring "war" against the family. Therefore, there was evidence offered by Reynolds at trial that was intended to establish the defense that it was Pratt who had committed these crimes. Moreover, Pratt's statements that were allowed into evidence by the trial judge were much more beneficial to Reynolds' theory of the crimes than the statements at issue in this claim regarding the manner of death. Even with this evidence before them, the jury rejected Reynolds' assertion that Pratt committed these crimes and found Reynolds guilty of the murders of the three victims.
In addition, the evidence at trial connecting Reynolds to these murders was substantial. DNA analysis revealed that his blood was scattered throughout the interior of the victims' trailer, contrary to his statement to authorities that he had never been in the trailer before. Testimony established that a car similar to that of Reynolds was seen at the scene of the crime the night before the victims were discovered. Direct evidence established a heated argument between Reynolds and the victim Danny Privett, and testimony at trial also established that obvious injuries on Reynolds appeared to have been from a knife blade inconsistent with his version of how they occurred. With the substantial *1142 evidence produced at trial by the State connecting Reynolds in these crimes, along with the clear insignificance of the statements of Pratt with regard to what he had been told about the manner of death of the victims as compared to the portions of the interview that were admitted into evidence, we conclude that any error in excluding these portions of Pratt's interview was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1135.
Next we must determine whether the portions of Pratt's statements that where properly found to be hearsay should have been before the jury as statements falling with the statements against interest exception to the hearsay rule of inadmissibility. Initially, the State asserts that this issue need not be addressed because the trial court erred in finding that Pratt was unavailable and, therefore, the statement against interest exception is totally inapplicable. Florida law requires that for the statement against interest exception to apply, the declarant must first be determined be "unavailable" for trial. See § 90.804, Fla. Stat. (2003). Unavailability is defined as meaning that the declarant:
(a) Is exempted by a ruling of a court on the ground of privilege from testifying concerning the subject matter of the declarant's statement;
(b) Persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so;
(c) Has suffered a lack of memory of the subject matter of his or her statement so as to destroy the declarant's effectiveness as a witness during the trial;
(d) Is unable to be present or to testify at the hearing because of death or because of then-existing physical or mental illness or infirmity; or
(e) Is absent from the hearing, and the proponent of a statement has been unable to procure the declarant's attendance or testimony by process or other reasonable means.
§ 90.804(1)(a)-(e), Fla. Stat. (2003). After a hearing on the issue of availability, the trial court determined that the defense had made reasonable efforts, albeit unsuccessful efforts, to secure Pratt's attendance at trial and, because he refused to attend, Pratt was "unavailable" for purposes of application of this rule.
A trial court's determination on the issue of availability "will not be disturbed unless an abuse of discretion clearly appears." Jackson v. State, 575 So.2d 181, 187 (Fla.1991) (quoting Outlaw v. State, 269 So.2d 403 (Fla. 4th DCA 1972)). The State relies upon Lawrence v. State, 691 So.2d 1068 (Fla.1997), as support for its assertion that the trial court abused its discretion when it found Pratt to be unavailable. However, the facts of Lawrence are distinguishable from the instant matter. In Lawrence, the investigator charged with locating the particular witness neglected to obtain directions to the witness's location when they were offered by the witness's boyfriend. Further, he never returned a phone call from the witness's boyfriend as he had promised prior to the proceeding for which the witness's testimony was needed. The record in the instant matter demonstrates that unlike the investigator in Lawrence, the investigator here used significant efforts to obtain Pratt's attendance at trial. The investigator in this case left no leads neglected and, in fact, was able to locate Pratt in Oklahoma and made arrangement to bring him back to Florida to testify at trial. The *1143 investigator's efforts were thwarted just a week prior to trial when Pratt violently erupted at the airport prior to boarding a plane to return to Florida with the investigator. Even after this failed attempt to secure Pratt's attendance, the investigator continued his efforts to contact Pratt through relatives but was unable to locate him. The trial court afforded full and fair consideration of the efforts made on the part of the defense in attempting to secure Pratt's attendance at trial, and we conclude that the trial court's finding that Pratt was unavailable for trial was not an abuse of discretion but was in fact the correct conclusion based on the evidence presented. See Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000) (Discretion is abused only "when the judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable [person] would take the view adopted by the trial court") (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).
Reynolds contends that, even if the trial court correctly found that these portions of Pratt's interview were hearsay, the statements should have been admitted under the statement against interest exception to the hearsay rule of inadmissibility. As noted above, this exception applies to "[a] statement which, at the time of its making,... tended to subject the declarant to liability ..., so that a person in the declarant's position would not have made the statement unless he or she believed it to be true." § 90.804(2)(c), Fla. Stat. (2003). Moreover, "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement." Id. Based on this statutory definition, we conclude that the trial court correctly found these statements did not qualify under this hearsay exception and were therefore properly determined to be inadmissible at trial.
Initially, we note that the statements at issue were not actually against Pratt's interest. The statement by Pratt that he was with his girlfriend during the early morning hours on the day the bodies were discovered, contrary to Reynolds' assertion, does not qualify as a statement against interest. Reynolds contends that this statement by Pratt tends to expose him to liability and exculpate the defendant. This contention by Reynolds is without merit. Pratt's statement discloses that he was with his girlfriend at his residence during the time frame in which the crimes at issue where estimated to have occurred. Clearly, a statement such as this would tend to exculpate Pratt as opposed to inculpating him, and, therefore, the trial court properly determined that the statement regarding Pratt's location did not come within the definition of that which constitutes a statement against interest. Similarly, the trial court also properly concluded that Pratt's statement that another individual informed him that Danny Privett had stabbed Robin and Christina also fails to come within the exception. If anything, this statement operates to the opposite of the predicate required to invoke the exceptionthe statement at issue here tends to exculpate Pratt rather than inculpate him in these crimes. The disclosure that Pratt, a neighbor and apparently a close acquaintance of the victims, stated that he had heard from another individual, Debbie Pretena, that Robin and Christina had been stabbed, purportedly prior to the release of this information, does not bring this statement within this exception to the hearsay rule of inadmissibility.
*1144 Reynolds also asserts that his constitutional right to a fair trial was denied by excluding portions of Pratt's statement even if the trial court properly applied the rules of evidence. However, we note that this particular claim was not presented at the trial court level, and, therefore, the claim has not been properly preserved for review. See Steinhorst, 412 So.2d at 338. Notwithstanding trial counsel's failure to preserve this issue, the claim lacks merit. Reynolds relies on Curtis v. State, 876 So.2d 13 (Fla. 1st DCA 2004), as support for his assertion. Contrary to Reynolds' assertion, the facts of Curtis are distinguishable from the instant matter, and, therefore, the rule of law discussed therein is inapplicable.
In Curtis, the district court held that the trial court erred in excluding an out-of-court confession even though it did not satisfy the statement against interest exception. See id. at 15-16. Crucial to the district court's decision in Curtis was that the statement excluded was more than just an out-of-court statementit was a confession by another individual to the crime with which Curtis had been charged. See id. at 16. The district court stressed this fact when it noted that the "general principle that state evidence rules must, in some instances, yield to greater principles established by the Constitution has been applied specifically to require the admission of a confession by a third party." Id. at 19 (emphasis supplied). Pratt's statement in the instant matter is not even similar to the confession that the trial court erroneously excluded in Curtis. Pratt never confessed to the crimes during his interview, so the constitutional concerns driving the district court's decision in Curtis simply are not present in the instant matter and, therefore, Curtis is inapplicable here.[2]
In addition to Curtis, Reynolds also relies upon Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), as support for his claim. As with Curtis, Chambers is also inapplicable to the instant matter. Similar to Curtis, the High Court in Chambers assessed whether the defendant's due process rights required the admission of an out-of-court confession by a third party to the crime with which Chambers had been charged, notwithstanding the state hearsay rules which required its exclusion. See id. at 298-303, 93 S.Ct. 1038. In holding that the Constitution required admission of the confession despite the state hearsay law, the High Court noted circumstances surrounding the confession that provided assurance as to its reliability. See id. at 300-01, 93 S.Ct. 1038. As the district court noted in Curtis, important factors to the High Court in Chambers included: (1) the confession was made spontaneously shortly after the crime; (2) the confession was corroborated; (3) the confession was truly against the declarant's penal interest; and (4) the declarant was available to testify and be cross-examined. See Curtis, 876 So.2d at 20 (citing Chambers, 410 U.S. at 300-01, 93 S.Ct. 1038). The facts surrounding Pratt's interview in the instant matter clearly do not satisfy any of these circumstances. *1145 Although the facts may support a finding that Pratt's statements were spontaneous and not coerced, the remaining indicia of reliability discussed in Chambers are not present here. The portion of Pratt's statement regarding information relayed by Debbie Pretena to Pratt about the manner of death was not corroborated. When asked if Pretena was going to be produced at trial to corroborate these statements, trial counsel responded: "Well we're working on that." The defense never produced Pretena to corroborate Pratt's statements at trial. Moreover, as discussed in more detail above, none of Pratt's statements at issue here were actually against his interest. Unlike the statement at issue in Chambers, Pratt's interview with the authorities did not contain a confession to the crimes for which Reynolds was convicted. Lastly, contrary to the circumstances present in Chambers, the trial court here found Pratt to be unavailable for trial. Therefore, Chambers does not support Reynolds' assertions that the Constitution requires the admission of Pratt's entire statement at trial.
Based on the analysis set forth above, we hold that the trial court properly found the statements by Pratt regarding his location during the timeframe when these crimes were committed to be inadmissible hearsay and not within the statement against interest exception to the hearsay rule of inadmissibility. In addition, although we conclude that the trial court erred in finding the statements regarding the manner of death to be inadmissible hearsay, we hold, based on our analysis above, that this error was harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1135.

B. Sufficiency of the Evidence
Reynolds next contends that the trial court erred in denying his motion for acquittal because the evidence was not sufficient to sustain his convictions. In reviewing a motion for judgment of acquittal, a de novo standard of review applies. See Pagan v. State, 830 So.2d 792, 803 (Fla.2003). Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. See id. (citing Donaldson v. State, 722 So.2d 177 (Fla.1998); Terry v. State, 668 So.2d 954, 964 (Fla.1996)). If, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. See Pagan, 830 So.2d at 803 (citing Banks v. State, 732 So.2d 1065 (Fla.1999)). In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Beasley v. State, 774 So.2d 649, 657 (Fla.2000) (quoting Lynch v. State, 293 So.2d 44, 45 (1974)). We have stated that "courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Lynch, 293 So.2d at 45.
However, "where a conviction is based wholly upon circumstantial evidence, a special standard of review applies." Darling v. State, 808 So.2d 145, 155 (Fla.2002). As stated in Darling:
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of *1146 whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
Id. (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)). Therefore, a motion for judgment of acquittal should be granted in a case based wholly upon circumstantial evidence if the state fails to present evidence from which the jury could exclude every reasonable hypothesis except that of guilt. See Darling, 808 So.2d at 155-56. Nonetheless, "[t]he state is not required to `rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." Id. at 156 (quoting Law, 559 So.2d at 189). Once the State meets this threshold burden, it becomes the jury's duty to determine "whether the evidence fails to exclude all reasonable hypotheses of innocence ..., and where there is substantial, competent evidence to support the jury verdict, [the Court] will not reverse." State v. Law, 559 So.2d 187, 188 (Fla.1989).
Reynolds asserts that the evidence of his guilt offered by the State in this case was entirely circumstantial and, therefore, the heightened standard of review should apply to our consideration of the trial court's denial of his motion for acquittal. Reynolds contends that the case against him rests solely on the evidence that his finger was injured and "tainted and inconsistent DNA evidence." Contrary to this assertion, the evidence presented against him at trial by the State was far more than Reynolds accepts. In addition to the evidence Reynolds has noted, the State also introduced expert testimony from a medical examiner demonstrating that the injury to Reynolds' hand was inconsistent with his explanation of the injury; testimony from a neighbor of the victims who saw Danny Privett sitting on Reynolds' car, which was parked at the victims' residence the night the crimes were committed; microscopic and DNA analysis of a pubic hair found at the crime scene matched a hair sample taken from Reynolds; Reynolds' admission during an interview with law officers that he had a heated argument with Danny Privett; eyewitness testimony corroborating the circumstances surrounding the argument between Reynolds and Danny Privett; evidence that Reynolds denied ever being in the victims' residencea statement that was clearly inconsistent with the considerable DNA evidence presented at trial which placed him inside the trailer; testimony from Reynolds' neighbor who saw him washing clothes at 5:30 a.m. on the morning the bodies were discovered; clothes found hanging on Reynolds' clothesline the morning the bodies were discovered that appeared to have been strongly bleached; and the testimony of two prisoners who had previously been incarcerated with Reynolds that Reynolds admitted to them that he had in fact committed the crimes. We have previously held that evidence similar to that offered in the instant matter refuted the assertion that the case was entirely circumstantial. See Meyers v. State, 704 So.2d 1368, 1370 (Fla.1997) (holding that the case could not be deemed wholly circumstantial where testimony at trial established that the defendant confessed to a former cellmate); Orme v. State, 677 So.2d 258, 261-62 (Fla. 1996) (holding that case involving evidence such as eyewitness testimony placing the defendant at the scene, acknowledgment *1147 by the defendant of a dispute with the victim and theft of the victim's purse, and DNA evidence suggesting that the defendant had engaged in sexual relations with the victim could not be deemed entirely circumstantial). Based on the foregoing, we conclude that Reynolds' claim that the State's case was based wholly upon circumstantial evidence is without support. The evidence admitted at trial demonstrates that the evidence presented by the State was not entirely circumstantial, and, therefore, we need not apply the special standard of review applicable to cases based solely on circumstantial evidence. See Fitzpatrick v. State, 900 So.2d 495, 506 (Fla.2005) ("[T]his Court need not apply the special standard of review applicable to circumstantial evidence cases because the State presented direct evidence in the form of DNA evidence and eyewitness testimony.").
In reviewing a trial court's denial of a defendant's motion for acquittal in a case not based entirely on circumstantial evidence, we look to determine whether, when viewing the evidence in a light most favorable to the State, sufficient evidence exists that would permit a rational trier of fact to find the elements of the crimes beyond a reasonable doubt. See Pagan, 830 So.2d at 803. A careful review of the above-noted evidence, along with the significant DNA evidence presented by the State demonstrating that Reynolds' blood was scattered over both inside and outside portions of the trailer, establishes that this standard has been satisfied. The State presented competent, substantial evidence to support the jury's verdicts, and we conclude that the trial court properly denied Reynolds' motion for judgment of acquittal.
Notwithstanding the above, even if we were to accept Reynolds' contention that the standard of review applicable to cases based wholly on circumstantial evidence is applicable to the instant matter, we would conclude that his claim should still be denied because the evidence offered at trial in support of the jury's verdicts was sufficient to satisfy even the higher standard of review applicable to such cases. The higher burden is one which would require the State to "introduce competent evidence which is inconsistent with the defendant's theory of events" to establish its case. Darling, 808 So.2d at 156. Here, the State clearly satisfied even this standard. Reynolds' theory of these crimes was that Justin Pratt committed them and that his statement to authorities that he was at home with his girlfriend, Nicole Edwards, at the time of the crimes was not true. However, the State countered this assertion by eliciting testimony from Edwards and Brenda Keck, a neighbor of Pratt, which was consistent with Pratt's statements to investigators. Moreover, testimony from a sheriff's investigator revealed that Pratt's residence was searched and that nothing of interest was found during that search. Additionally, Reynolds argued at trial that the DNA evidence presented against him was tainted, unreliable, and inconclusive. Again, the State provided substantial testimony rebutting this assertion. Lastly, Reynolds' version of the facts with regard to his injured finger and ankle was also rebutted by the State when it presented testimony from the medical examiner that Reynolds' explanation was implausible. Based on the foregoing, it is clear that the State introduced competent, substantial evidence at trial that was inconsistent with Reynolds' theory of events, and, therefore, the trial court properly denied Reynolds' motion for judgment of acquittal and submitted this case to the jury.

C. Waiver of Sentencing Recommendation from Penalty Phase Jury
Reynolds next asserts that the trial court abused its discretion and committed *1148 reversible error when it refused to honor Reynolds' waiver of his right to a jury's penalty recommendation as to the appropriate sentence. This claim is without merit. We have "continually recognized that where a defendant has been convicted of a capital crime, he may waive his right to a jury in the sentencing phase, provided the waiver is voluntary and intelligent." State v. Hernandez, 645 So.2d 432, 434-35 (Fla.1994) (citing Palmes v. State, 397 So.2d 648 (Fla.1981); Holmes v. State, 374 So.2d 944 (Fla.1979); State v. Carr, 336 So.2d 358 (Fla.1976); Lamadline v. State, 303 So.2d 17 (Fla.1974)). We have also recognized that even after a defendant makes a knowing and intelligent waiver of this right, a trial judge "may in his or her discretion either require an advisory jury recommendation, or may proceed to sentence the defendant" without one. Carr, 336 So.2d at 359 (emphasis supplied). This Court, on more than one occasion, has upheld the exercise of a trial court's discretion in favor of requiring an advisory jury recommendation. See Sireci v. State, 587 So.2d 450 (Fla.1991); Thompson v. State, 389 So.2d 197 (Fla.1980).
In Muhammad v. State, 782 So.2d 343 (Fla.2001), we addressed a scenario almost identical to the present case. In Muhammad, the defendant waived the right to a jury's sentencing recommendation and the right to present mitigating evidence. See id. at 350. Notwithstanding the defendant's waiver, the trial judge required a jury sentencing recommendation. See id. The jury returned a sentencing recommendation of death by a vote of ten to two. See id. In sentencing Muhammad to death, the trial court gave great weight to the jury's recommendation. See id. at 361. On appeal, Muhammad alleged that the trial court abused its discretion by requiring an advisory sentence despite Muhammad's waiver of his right to present mitigating evidence and his waiver of a jury's sentencing recommendation. See id. We rejected this claim, holding that the trial court did not abuse its discretion by requiring an advisory sentence even though Muhammad waived presentation of mitigation. See id. However, we did conclude that "reversible error occurred when the trial court gave great weight to the jury's recommendation in imposing the death penalty despite the fact that no mitigating evidence was presented for the jury's consideration." Id.
Based on our holding in Muhammad, Reynolds' claim must be denied. The trial court below cannot be said to have abused its discretion in requiring a penalty phase jury to render an advisory sentence solely because Reynolds waived the presentation of mitigating evidence before the penalty phase jury. See id. Additionally, the trial court recognized the error committed by the trial court in Muhammad, and explicitly took measures to avoid the same error. In its sentencing order, the trial court below expressly recognized that Reynolds "presented no mitigation to the jury," and, therefore, the sentencing order did "not give the recommendation of the jury great weight ... in accordance with Muhammad." (Emphasis supplied.) Based on the foregoing analysis, we conclude that the trial court did not abuse its discretion, and, therefore, Reynolds' claim is denied.

D. Prior Violent Felony Aggravating Circumstance
Reynolds next claims that it was reversible error for the trial court to allow testimony providing details surrounding a prior violent felony conviction that included facts tending to establish crimes for which he was not convicted. To establish the prior violent felony aggravating circumstance *1149 during Reynolds' penalty phase trial, the State, in addition to the contemporaneous killings in the present case, presented certified copies of prior convictions of Reynolds for aggravated robbery, aggravated assault, and aggravated battery. In addition, the State presented the testimony of the victim of his prior conviction for aggravated battery, Tonya Chapple. During Chapple's testimony, she described the circumstances surrounding the criminal episode underlying this conviction. Reynolds objected to the portions of Chapple's testimony in which she described details of the episode that tended to establish crimes for which Reynolds was not convicted. The trial judge overruled the objection, and the witness was allowed to testify in detail regarding the entire circumstances of the crime. Reynolds asserts that the trial court committed reversible error by allowing Chapple to present these details which would tend to implicate Reynolds in the commission of the crimes of sexual battery and armed kidnapping crimes for which he was not convicted.
When the State is offering evidence to establish the prior violent felony aggravating circumstance, we have held:
"[I]t is appropriate in the penalty phase of a capital trial to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction." Rhodes v. State, 547 So.2d 1201, 1204 (Fla.1989). Further, this Court explained that "[t]estimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence." Id.

Dufour v. State, 905 So.2d 42, 63 (Fla. 2005). Applying our prior decisions to the testimony presented in the instant matter, we conclude that the trial court did not err in allowing Chapple to testify with regard to the details surrounding the prior conviction. The instant matter is highly analogous to the facts underlying our decision in Anderson v. State, 841 So.2d 390 (Fla. 2003). In Anderson, during the penalty phase trial the State elicited testimony from the defendant's wife regarding a previous felony conviction for attempted sexual battery which made it clear that the defendant not only attempted, but actually completed the crime of sexual battery on the wife's daughter. See id. at 406-07. On appeal, Anderson asserted that "since he pled to attempted sexual battery, it was error to permit [the wife] ... to describe the details of a completed crime." Id. at 407. We denied Anderson's claim holding that "[w]hether a crime constitutes a prior violent felony is determined by the surrounding circumstances of the prior crime," and, therefore, "the trial court did not err in permitting the State to present evidence regarding the details of the attempted sexual batteries." Id.; see also Morgan v. State, 415 So.2d 6, 12 (Fla.1982) (holding that it was not error to allow the penalty phase jury to hear evidence that the defendant's previous conviction of second-degree murder was obtained pursuant to an indictment for first-degree murder).
Based on the foregoing, we conclude that Reynolds' claim should be denied. Chapple's testimony during the penalty phase merely relayed the details surrounding Reynolds' previous conviction for aggravated battery. Even though the testimony involved circumstances that may have suggested the simultaneous commission of other crimes for which Reynolds was not convicted, Chapple's testimony *1150 was not rendered inadmissible. See Anderson v. State, 841 So.2d 390 (Fla. 2003). Chapple's testimony appropriately provided the jury with details surrounding Reynolds' prior conviction, which were essential in assisting the "jury in evaluating the character of the defendant and the circumstances of the crime so that the jury [could] make an informed recommendation as to the appropriate sentence." Rhodes v. State, 547 So.2d 1201, 1204 (Fla. 1989). Moreover, Reynolds' confrontation rights are not at issue here because Chapple was available and was cross-examined during the penalty phase trial. Based on the foregoing analysis, Reynolds' claim is denied.

E. Penalty Phase Jury Instructions
Reynolds next takes issue with the instructions to the jury prior to penalty phase deliberations. Reynolds claims that section 921.141 of the Florida Statutes (2003) and the standard jury instructions based thereon unconstitutionally place a higher burden of persuasion on the defense to establish that life is the appropriate sentence than is placed on the State to demonstrate that death is the appropriate sentence. Specifically, Reynolds takes issue with the following language found in Florida's standard jury instruction, which was read to the jury during the penalty phase trial:
[W]hether sufficient aggravating circumstances exist that would justify the imposition of the penalty and, second, whether there are mitigating circumstances sufficient to outweigh the aggravating circumstances, if any.
See Fla. Std. Jury Instr. (Crim.) 7.11 (emphasis supplied); see also § 921.141(2), Fla. Stat. (2003). Additionally, Reynolds claims that similar language found in section 921.141 of the Florida Statutes (2003), the statutory section upon which the above instruction is based, also renders that statutory section unconstitutional. Reynolds asserts that the language requires a defendant to prove the existence of mitigating circumstances sufficient to outweigh the aggravating circumstances established and renders Florida's capital sentencing scheme unconstitutional.
Initially, the State responds that the specific claim now asserted by Reynolds on appeal was not properly preserved for review. "For an issue to be preserved for appeal, ... it `must be presented to the lower court and the specific legal argument or ground to be argued on appeal must be part of that presentation if it is to be considered preserved.'" Archer v. State, 613 So.2d 446, 448 (Fla.1993) (quoting Tillman v. State, 471 So.2d 32, 35 (Fla.1985)). Contrary to the State's assertion, we conclude that at least a portion of this claim was preserved for appellate review. Prior to trial, Reynolds filed a motion to have section 921.141 declared unconstitutional asserting that it violated this Court's holding in Arango v. State, 411 So.2d 172 (Fla.1982), which required that the State show that the aggravating circumstances outweigh the mitigating circumstances. Therefore, it does appear that Reynolds' claim regarding the constitutionality of section 921.141 of the Florida Statutes (2003) was presented to the trial court and, therefore, was properly preserved for review.
Despite the fact that his challenge to section 921.141 of the Florida Statutes (2003) was adequately preserved, it does not appear that Reynolds' claim with regard to the specific penalty phase jury instruction was properly presented to the trial court. To challenge jury instructions, *1151 a party must object to the form of those instructions and specifically state the grounds upon which the objection is based. See Fla. R.Crim. P. 3.390(d) ("No party may raise on appeal the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection."). A careful review of the record reveals that the claim now asserted by Reynolds with regard to the penalty phase jury instruction was not presented to the trial court for consideration. Although just prior to the penalty phase jury instructions Reynolds renewed his pretrial objections to the instructions to be given, the record does not reveal that any of those pretrial objections presented the same distinct issue now presented on appeal. Therefore, it does not appear that this particular claim was properly preserved for review by this Court. See Fla. R.Crim. P. 3.390(d).
Notwithstanding the above, the view upon which both of these claims are based has been consistently rejected by this Court. See Asay v. Moore, 828 So.2d 985 (Fla.2002); Carroll v. State, 815 So.2d 601 (Fla.2002); Rutherford v. Moore, 774 So.2d at 637 (Fla.2000); San Martin v. State, 705 So.2d 1337 (Fla.1997); Shellito v. State, 701 So.2d 837 (Fla.1997); Arango v. State, 411 So.2d 172 (Fla.1982). However, Reynolds urges this Court to adopt the logic of the Supreme Court of Kansas in State v. Marsh, 278 Kan. 520, 102 P.3d 445 (2004), cert. granted, 544 U.S. 1060, 125 S.Ct. 2517, 161 L.Ed.2d 1109 (2005), recede from our prior holdings, and declare section 921.141 and the standard jury instruction thereon unconstitutional. Contrary to this request, Marsh is distinguishable from the instant matter, and, therefore, the reasoning employed therein is inapplicable. In Marsh, the Supreme Court of Kansas held that the statute governing capital penalty phase trials in Kansas was unconstitutional. See Marsh, 102 P.3d at 458. The statute at issue in Marsh read as follows:
If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 . . . exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law.
Kan. Stat. Ann. § 21-4624(e) (1995) (emphasis supplied). Of critical importance to the Kansas court's holding the statute unconstitutional was the language of the statute as enacted: "In the event of equipoise, i.e., the jury's determination that the balance of any aggravating circumstances and any mitigating circumstances weighed equal, the death penalty would be required." Marsh, 102 P.3d at 457 (emphasis supplied). Contrary to the Kansas statute, Florida's capital sentencing statute and the jury instruction thereon, although containing similar language as to the balancing of aggravating and mitigating circumstances, does not require that a death sentence be rendered in the event of "equipoise." See § 921.141(2), Fla. Stat. (2003) ("After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court, based upon the following matters: (a) Whether sufficient aggravating circumstances exist as enumerated in subsection (5); (b) Whether sufficient mitigating circumstances exist which outweigh the aggravating circumstances *1152 found to exist; and (c) Based on these considerations, whether the defendant should be sentenced to life imprisonment or death."). Moreover, unlike the capital sentencing scheme in Florida where it is the trial court which makes the ultimate sentencing determination, in Kansas it is the jury that renders the final sentence. See Kan. Stat. Ann. § 21-4624(e). Based on the dissimilarities in the statutory sentencing schemes in Kansas and Florida, we conclude that the reasoning employed in Marsh is inapplicable to the instant matter. Reynolds has failed to establish a valid basis for this Court to consider reversing its established precedent on this issue, and we therefore deny this claim.

F. Residual or Lingering Doubt
Reynolds also asserts that the trial court erred in refusing to consider residual doubt in its sentencing order. In its sentencing order, the trial court noted that "`residual' or `lingering' doubt is not an appropriate mitigating circumstance," and that any evidence offered at the Spencer[3] hearing "with respect to residual or lingering doubt [would] not be considered by the Court as a non-statutory mitigator for purposes of sentencing." Reynolds asserts that the trial court's refusal to consider residual doubt when sentencing Reynolds rendered his sentences of death unconstitutional. Reynolds' claim has been repeatedly rejected by this Court. See Darling v. State, 808 So.2d 145, 162 (Fla.2002) ("We have repeatedly observed that residual doubt is not an appropriate mitigating circumstance."); Sims v. State, 681 So.2d 1112 (Fla.1996) (same); Bogle v. State, 655 So.2d 1103, 1107 (Fla.1995) (same); Preston v. State, 607 So.2d 404, 411 (Fla.1992) (same); Downs v. State, 572 So.2d 895, 900 (Fla.1990) (same); Aldridge v. State, 503 So.2d 1257, 1259 (Fla.1987) (same); King v. State, 514 So.2d 354, 358 (Fla.1987) (same). Notwithstanding our rejection of this claim, Reynolds asserts that the United States Supreme Court's opinion in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), requires that lingering doubt be considered as relevant mitigating evidence. However, this claim itself has been rejected by the High Court. See Franklin v. Lynaugh, 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion) ("Our edict that, in a capital case, `"the sentencer . . . [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense,"' Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting Lockett, 438 U.S. at 604, 98 S.Ct. at 2964), in no way mandates reconsideration by capital juries, in the sentencing phase, of their `residual doubts' over a defendant's guilt. . . . This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor."). Based on the above, we conclude that the trial court appropriately excluded evidence offered to establish residual or lingering doubt from consideration when making its sentencing determination.

G. Aggravation and Mitigation
The next issue raised by Reynolds involves claims that his sentences of death were impermissibly imposed because the trial court included improper aggravating circumstances, excluded existing mitigation, and failed to find that the mitigation *1153 established outweighed the aggravating circumstances.[4] The standard for evaluating a trial court's finding of an aggravating circumstance was set forth by this Court in Willacy v. State, 696 So.2d 693 (Fla.1997):
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubtthat is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Id. at 695 (footnote omitted).

Heinous, Atrocious, or Cruel Aggravating Circumstance
Reynolds asserts that there was a lack of competent, substantial evidence to support the trial court's finding that the heinous, atrocious, or cruel (HAC) and commission to avoid arrest aggravating circumstances had been established. The trial court's sentencing order outlined the following evidence that it considered in making its determination that HAC applied to the murder of Robin Razor:
a. Dr. Sarah Irrgang, the medical examiner, testified that the victim, Robin Razor, suffered multiple stab wounds to the head and neck area and one to the torso. It was Dr. Irrgang's testimony that Robin Razor also suffered a number of defensive wounds to the arms and hands.
b. The presence of defensive wounds allows the assumption to be made that the victim was alive unless shown otherwise by the evidence.
c. The existence of numerous defensive wounds demonstrates that the victim was aware of her plight and was resisting.
d. The medical examiner also testified that torment wounds were present. Wounds of this type are normally associated with the perpetrator taking a depraved, measured approach to the infliction of the injury and taking pleasure in his cruel activity.
e. The numerous stab and cutting wounds suffered by the victim, Robin Razor, are consistent with having been made by a weapon such as a knife and did produce copious amounts of blood. At the moment that the victim, Robin Razor, was being attacked, it is not known whether or not her daughter was still alive and conscious or unconscious or had been murdered. Regardless, in the close confines of that cramped camping trailer, a bloodied Robin Razor, in great pain as a result of numerous stab wounds to her body, was forced to fight a losing battle for her life knowing that either her daughter had already been killed and she was next or that if Reynolds prevailed, her daughter would suffer certain death. It is not difficult to imagine the fear, terror and emotional strain that accompanied Robin Razor as she fought for her life knowing full well the consequences of losing the battle. Socher[Sochor] v. Florida, 580 So.2d 595, 603 (Fla.1991), reversed on other grounds, Socher[Sochor] v. State, [504 U.S. 527,] 112 S.Ct. 2114[, 119 L.Ed.2d 326] (1992).

*1154 f. In addition to the victim, Robin Razor, having suffered multiple stab and cut wounds, evidence was presented at trial that the victim was beaten about her head with apiece of concrete block. The blood of Danny Privett was mingled with that of the victim, Robin Razor, on the concrete block located within the camper.
g. As a result of the above-mentioned factors, Robin Razor, while still conscious and alert suffered great physical pain, mental torment, fear and emotional anguish.
With regard to Christina Razor, the trial court made the following findings:
a. Dr. Sarah Irrgang, the medical examiner, testified that the victim Christina Razor, suffered two stab wounds to the neck and shoulder area, contusions to her face, and injuries to her mouth. It was Dr. Irrgang's testimony that Christina Razor also suffered an abrasion on the back of one of her hands which was characterized as being consistent with a defensive wound.
b. The presence of defensive wounds allows the assumption to be made that the victim was alive unless shown otherwise by the evidence.
c. The existence of a defensive wound demonstrates that the victim was aware of her plight and was resisiting[resisting]. The stab wounds suffered by the victim, Christina Razor, are consistent with having been made with a weapon such as a knife.
d. At the moment that the victim, Christina Razor, was being attacked, it is not known whether or not her mother was still alive and conscious or unconscious or had been murdered. Regardless, in the close confines of that cramped camping trailer, Christina Razor, in great pain and fear, was forced to fight a losing battle for her life knowing that either her mother had already been killed and she was next or that after Reynolds killed her, he was sure to end her mother's life. For a child to experience the fear, terror and emotional strain that accompanied Christina Razor as she fought for her life, knowing full well that she was fighting a losing battle, is unimaginable, heinous, atrocious and cruel. In a prior decision, the Florida Supreme Court has dealt with a similar situation. Francis v. State, 808 So.2d 110 (Fla.2003[2002]). The Francis decision discusses the unique circumstances associated with close proximity homicides:
Moreover, as we have previously noted, "the fear and emotional strain preceding the death of the victim may be considered as contributing to the heinous nature of a capital felony." See Walker, 707 So.2d at 315; see also James v. State, 695 So.2d 1229, 1235 (Fla.1997) ("[F]ear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel."). In this case, although the evidence did not establish which of the two victims was attacked first, the one who was first attacked undoubtedly experienced a tremendous amount of fear, not only for herself, but also for what would happen to her twin. In a similar manner, the victim who was attacked second must have experienced extreme anguish at witnessing her sister being brutally stabbed and in contemplating and attempting to escape her inevitable fate. We arrive at this logical inference based on the evidence, *1155 including photographs presented at the guilt phase, which clearly establishes that these two women were murdered in their home only a few feet apart from each other. As a result, we conclude that the trial court's HAC finding is further buttressed by the logical fear and emotional stress experienced by the two elderly sisters prior to their deaths as the events were unfolding in close proximity to one another.
The evidence presented at trial through the admission of the medical examiner's testimony and the copious amounts of DNA evidence offered support the trial court's findings regarding the circumstances surrounding the murders.
Notwithstanding the foregoing, Reynolds asserts that HAC is inapplicable because the evidence does not establish that he intended or desired to inflict a high degree of pain or that he was utterly indifferent to or enjoyed the suffering of his victims. However, we have specifically rejected Reynolds' contention. In Lynch v. State, 841 So.2d 362 (Fla.2003), we held that "[i]n determining whether the HAC factor was present, the focus should be upon the victim's perceptions of the circumstances as opposed to those of the perpetrator." Id. at 369 (emphasis supplied); see also Farina v. State, 801 So.2d 44, 53 (Fla.2001) ("[The HAC] aggravator pertains more to the victim's perception of the circumstances than to the perpetrator's."); Guzman v. State, 721 So.2d 1155, 1160 (Fla.1998) ("The intention of the killer to inflict pain on the victim is not a necessary element of the aggravator.") Based on the above, Reynolds' contention lacks merit.
Reynolds next asserts that HAC is inapplicable because there was evidence that the victims lost consciousness quickly and, therefore, the prolonged suffering associated with HAC is not present in this case. As support for his contention, Reynolds relies on Rhodes v. State, 547 So.2d 1201 (Fla.1989), wherein this Court struck the trial court's application of HAC to a strangulation murder where evidence supported the defendant's "statement that the victim may have been semiconscious at the time of her death." Id. at 1208. Rhodes is distinguishable from the instant matter. In the present case, the testimony of the medical examiner established that both of the victims exhibited defensive wounds, indicating that they were conscious during some part of the attack and attempting to ward off their attacker. Additionally, the medical examiner testified that the evidence indicated that there had been a "violent struggle" during the attacks, again establishing that the victims were aware of the attack and attempting to defend themselves. Moreover, the medical examiner testified that the wounds to Robin Razor's torso were consistent with being "torment wounds"wounds that are intended to cause aggravation and to scare the victim.
This Court has repeatedly upheld the HAC aggravating circumstance in cases where a victim was stabbed numerous times. See, e.g. Guzman v. State, 721 So.2d 1155 (Fla.1998); Mahn v. State, 714 So.2d 391 (Fla.1998); Rolling v. State, 695 So.2d 278 (Fla.1997); Williamson v. State, 681 So.2d 688, 698 (Fla.1996); Finney v. State, 660 So.2d 674, 685 (Fla.1995); Barwick v. State, 660 So.2d 685, 696 (Fla. 1995); Pittman v. State, 646 So.2d 167, 173 (Fla.1994); Campbell v. State, 571 So.2d 415 (Fla.1990); Hardwick v. State, 521 So.2d 1071, 1076 (Fla.1988); Nibert v. State, 508 So.2d 1 (Fla.1987); Johnston v. State, 497 So.2d 863, 871 (Fla.1986); Peavy v. State, 442 So.2d 200 (Fla.1983). In *1156 Francis v. State, 808 So.2d 110 (Fla.2001), we noted that we have upheld the application of HAC even when the "medical examiner determined that the victim was conscious for merely seconds." Id. at 135. In Rolling, we upheld the application of the HAC aggravating circumstance even when the medical examiner testified that the "victim would have remained alive for a period of thirty to sixty seconds." Rolling, 695 So.2d at 296. Moreover, in Peavy the Court determined that the application of HAC was not improper when the medical examiner testified the victim would have lost consciousness within seconds. See 442 So.2d at 202-03. Testimony in this case established that Christina Razor could have remained conscious for a "matter of a minute or two," that the stab wounds to Robin Razor were likely to have occurred during an active struggle, and that she was conscious during the perpetrator's infliction of blunt force trauma to her head. Therefore, based on these prior decisions in which we upheld a trial court's finding of HAC, we likewise conclude that competent, substantial evidence exists in the instant matter to support the trial court's finding that these murders satisfied the HAC aggravating factor.
In addition to the above, we have held that "fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel." James v. State, 695 So.2d 1229, 1235 (Fla.1997). Further, "the victim's mental state may be evaluated for purposes of such determination in accordance with the common-sense inference from the circumstances." Swafford v. State, 533 So.2d 270, 277 (Fla.1988). Significantly, this case involved the killing of a mother and her daughter within close proximity. Therefore, consistent with the trial court's findings in its sentencing order, "although the evidence did not establish which of the two victims was attacked first, the one who was first attacked undoubtedly experienced a tremendous amount of fear, not only for herself, but also for what would happen to [the other]. In a similar manner, the victim who was attacked second must have experienced extreme anguish at witnessing [the other] being brutally stabbed and in contemplating and attempting to escape her inevitable fate." Francis v. State, 808 So.2d 110, 135 (Fla.2001). All of these circumstances leading up to the killing of Robin and Christina Razor, in addition to the actual wounds inflicted upon the victims, support the trial court's finding of the HAC aggravator.
Based on the foregoing, we hold that there was competent, substantial evidence supporting the trial court's finding that HAC applied to the murders committed here.

Avoiding a Lawful Arrest Aggravating Circumstance
Reynolds next asserts that the trial court erred in finding that the murders were committed for the purpose of avoiding a lawful arrest. We have held:
"[T]o establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness." Connor v. State, 803 So.2d 598, 610 (Fla. 2001), cert. denied, 535 U.S. 1103[, 122 S.Ct. 2308, 152 L.Ed.2d 1063] (2002); see also Alston v. State, 723 So.2d 148, 160 (Fla.1998). "Mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest *1157 aggravator. Likewise, the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator." Looney v. State, 803 So.2d 656, 676 (Fla.2001) (citation omitted), cert. denied, 536 U.S. 966[, 122 S.Ct. 2678, 153 L.Ed.2d 850] (2002); see also Consalvo v. State, 697 So.2d 805, 819 (Fla.1996).
Bell v. State, 841 So.2d 329, 336 (Fla.2002). However, "[e]ven without direct evidence of the offender's thought processes, the arrest avoidance factor can be supported by circumstantial evidence through inference from the facts shown." Swafford v. State, 533 So.2d 270, 276 n. 6 (Fla.1988); see also Preston v. State, 607 So.2d 404, 409 (Fla.1992). Reynolds claims that this standard was not met in this case.
With regard to this aggravating circumstance, the trial court made the following findings in its sentencing order:
a. The Defendant knew the victims; and the victims, Danny Ray Privett and Robin Razor, knew the Defendant. They lived in close proximity to each other on the same street.
b. It was proven at trial that victim, Danny Ray Privett, was surreptitiously murdered outside the trailer. This stealthy killing was committed while Danny Ray Privett was about to engage, in the act of, or having just finished urinating. The Defendant approached the victim, unnoticed, then viciously and deliberately battered the victim's skull with a piece of concrete.
c. The victim was rendered unconscious almost immediately and died a short period thereafter without regaining consciousness according to the Medical Examiner.
d. The gooseneck prowler trailer, being located some distance away, would not necessarily afford its occupants the opportunity to either see or hear the murder of Danny Ray Privett.
e. Should the perpetrator be unknown to the victims located inside the gooseneck prowler trailer, there would be no need for him to proceed to the trailer and murder its occupants if he was not seen or heard by the remaining victims.
f. The victim, Robin Razor, did know the Defendant and had expressed her dislike and mistrust of the Defendant to several acquaintances. It was necessary for the Defendant to eliminate Robin Razor to avoid arrest because Robin Razor would advise the authorities that the Defendant would be a primary suspect.
g. Darrell Courtney testified at the guilt/innocence phase that the Defendant admitted that he had killed the victims. The Defendant expressed regret to Courtney over having to kill the child, Christina Razor, but advised that "with my record I couldn't afford to leave any witnesses."
h. The relationship that existed between the Defendant and Darrell Courtney was borne out of mutual respect due to their joint status of being convicted felons who had served time in prison. Darrell Courtney is logically the type of individual with whom the Defendant would share this information concerning the murders. The Defendant also had requested that Darrell Courtney perform an act on the Defendant's behalf concerning a jail guard. Said request was set forth in the Defendant's letter to Courtney and admitted into evidence.
i. This aggravating circumstance has been proven beyond all reasonable doubt. This aggravating circumstance is given great weight by the Court.
*1158 Based on our review of the record, we conclude that the trial court's findings are supported by competent, substantial evidence and should be affirmed. See Willacy, 696 So.2d at 695. Reynolds contends that the mere fact that the Razor family knew Reynolds and that Robin Razor disliked him is insufficient to support the avoid arrest aggravating circumstance. Initially, we note that testimony elicited during Reynolds' interview with the authorities and from witnesses at trial supported the trial court's finding that the Razor family knew Reynolds and that a disagreement had occurred between Reynolds and the family. Moreover, in addition to this testimony, as the trial court noted, there was testimony from Darrell Courtney regarding a conversation Courtney had with Reynolds during which he admitted to committing the crimes and stated: "[L]ook, with my record, I can't leave any witnesses. . . . [B]ut I do regret doing the little girl." Although Courtney's testimony was somewhat impeached by Robert Scionti's testimony at trial, this does not preclude the trial court from considering Courtney's testimony in its analysis of the aggravators present. It is clear from the trial court's sentencing order that it found Courtney's testimony credible because the trial court relied on this testimony as support for this statutory aggravating circumstance. The trial court is in the best position to assess the credibility of a witness, and we are mindful to accord the appropriate deference to the trial court's assessment of this witness's testimony in our review of whether competent, substantial evidence exists to support this statutory aggravator. See Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999) ("We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact. . . . In many instances, the trial court is in a superior position `to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses.'") (quoting Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976)). We have upheld the finding of this aggravator in cases in which the defendant has expressed apprehension regarding arrest. See Looney v. State, 803 So.2d 656, 676-78 (Fla.2001); see also Trease v. State, 768 So.2d 1050, 1056 (Fla. 2000); Sliney v. State, 699 So.2d 662 (Fla. 1997). The statements made by Reynolds to Courtney regarding his apprehension of arrest given his previous record "appear[ ] to be exactly the type of apprehension . . . this Court finds determinative of establishing the avoid arrest aggravator." Looney, 803 So.2d at 677.
Notwithstanding the above, even if we were to agree with Reynolds and conclude that the trial court erred in finding this aggravating circumstance, the error would be harmless because we can state beyond a reasonable doubt that any error in this regard did not affect the result in this case. See DiGuilio, 491 So.2d at 1135 (holding that error is considered harmless if it is established "beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction"). Even if we struck this aggravating circumstance, three other aggravators would remain for the murder of Robin Razorthe murder was especially heinous, atrocious, or cruel, Reynolds had been convicted previously of another capital felony or a felony involving a threat of violence to the person, and the murder was committed during the commission of or attempt to commit burglary *1159 and four other aggravators would remain for the murder of Christina Razorthe murder was especially heinous, atrocious, or cruel, Reynolds had been convicted previously of another capital felony or a felony involving a threat of violence to the person, the murder was committed during the commission of or attempt to commit burglary, and the victim was a person less than twelve years of age. Therefore, even if we were to agree that the trial court erred in finding the avoid arrest aggravator, which we do not, the sentences of death imposed under the circumstances of this case would still be proportional. See discussion of proportionality review infra pp. 1160-61.

Mitigation
Turning now to the trial court's assessment of the mitigating circumstances in this case we note that a trial court must find a mitigating circumstance "when a reasonable quantum of competent, uncontroverted evidence of a mitigating circumstance is presented." Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). However, "[a] trial court may reject a defendant's claim that a mitigating circumstance has been proved, . . . provided that the record contains `competent substantial evidence to support the trial court's rejection of these mitigating circumstances.'" Id. (quoting Kight v. State, 512 So.2d 922, 933 (Fla.1987)). A trial court's decision regarding the weight to be assigned to a mitigating circumstance that it determines has been established is "within the trial court's discretion, and its decision is subject to the abuse-of-discretion standard." Kearse v. State, 770 So.2d 1119, 1133 (Fla. 2000); see also Trease, 768 So.2d at 1055; Cole v. State, 701 So.2d 845, 852 (Fla.1997). Under the abuse of discretion standard, a trial court's ruling will be upheld unless the "judicial action is arbitrary, fanciful, or unreasonable, . . . [and] discretion is abused only where no reasonable [person] would take the view adopted by the trial court." Trease, 768 So.2d at 1053 n. 2 (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).
Reynolds claims that the trial court improperly assigned little weight to or inexplicably found nonexistent the following nonstatutory mitigation: (1) Reynolds cooperated with the police; (2) Reynolds exhibited good courtroom behavior; (3) Reynolds was remorseful; (4) Reynolds suffered a difficult childhood; (5) Reynolds loved his mother and cared for his wheelchair-bound sister; and (6) Reynolds was gainfully employed at the time of the crimes. However, Reynolds provides no support for his assertion that the trial court abused its discretion when assigning little weight to the nonstatutory mitigation that it found to exist. Contrary to Reynolds' assertion that the trial court failed to provide details of its weighing process with support from the evidence, our review of the sentencing order reveals that the trial court did in fact provide ample analysis and support for its determination as to the weight it assigned the mitigation found to exist. Moreover, the only nonstatutory mitigation cited by Reynolds that was not addressed in the trial court's sentencing orderthat Reynolds was remorseful was not supported by the evidence. The cases that Reynolds advances to support his claim that the trial court erred in failing to find this nonstatutory mitigating circumstance are inapplicable to the instant matter. The majority of these cases address instances where the defendant expressed remorse for having committed the crimes. See Snipes v. State, 733 So.2d 1000 (Fla.1999); Nibert v. State, 574 So.2d *1160 1059 (Fla.1990); Morris v. State, 557 So.2d 27 (Fla.1990). Contrary to these cases, Reynolds has in no way expressed such remorse for the crimes at issue here. In fact, even at this juncture in his case, Reynolds still contends that he did not the commit these crimes. The remaining case cited by Reynolds merely stands for the proposition that lack of remorse should not be considered when determining if a murder was HAC, and that "[a]ny convincing evidence of remorse may properly be considered in mitigation." Pope v. State, 441 So.2d 1073, 1078 (Fla.1983). As we previously stated, there was no evidence of remorse presented by Reynolds during the trial, and, therefore, the trial court properly concluded that this mitigating circumstance had not been established.
In summary, the trial court's analysis of the mitigating circumstances found to exist is supported by competent, substantial evidence. Additionally, no abuse of discretion has been established with regard to the weight to be assigned to the mitigation found to have been established. Moreover, the trial court properly found that Reynolds had failed to offer sufficient evidence to support a finding that Reynolds was remorseful for having committed the crimes. Therefore, this claim is denied.

H. Constitutionality of Florida's Death Penalty
Reynolds next asserts that Florida's capital sentencing scheme violates his Sixth Amendment right and his right to due process under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed the contention that Florida's capital sentencing scheme violates the United States Constitution under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and denied relief. See also Jones v. State, 845 So.2d 55, 74 (Fla.2003). We conclude that Reynolds is likewise not entitled to relief on this claim. Furthermore, one of the aggravating circumstances found by the trial court in this case was prior convictions of a violent felony, "a factor which under Apprendi and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla.2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.) (rejecting Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Accordingly, Reynolds' claim is denied.

I. Proportionality Review
Finally, although Reynolds does not challenge the proportionality of his death sentence, we must ensure that the sentence is proportional. See Rimmer v. State, 825 So.2d 304, 331 (Fla.) ("Although appellant does not argue the proportionality of the death sentence in this case, this Court must nevertheless conduct a proportionality review."), cert. denied, 537 U.S. 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002). This review "is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a `thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases.'" Beasley v. State, 774 So.2d 649, 673 (Fla.2000) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990)).
The jury in this action recommended the death penalty by a vote of twelve to zero for both murders. The trial court considered *1161 the following aggravating factors with respect to both Robin and Christina Razor: (1) Reynolds was previously convicted of another capital felony or a felony involving the use or threat of violence to the person (great weight), see § 921.141(5)(b), Fla. Stat. (2003); (2) Reynolds committed the murder while engaged in or an accomplice in the commission of or an attempt to commit any burglary (great weight), see § 921.141(5)(d), Fla. Stat. (2003); (3) Reynolds committed the murder for the purpose of avoiding or preventing a lawful arrest (great weight), see § 921.141(5)(e), Fla. Stat. (2003); and (4) Reynolds committed the murder in this case in an especially heinous, atrocious, or cruel fashion (great weight), see § 921.141(5)(h), Fla. Stat. (2003). With respect to Christina Razor's murder, the trial court also considered the additional aggravating circumstance that the victim was a person less than twelve years of age (great weight), see 921.141(5)(l), Fla. Stat. (2003).
In mitigation, the trial judge found no statutory mitigating circumstances had been established. The trial judge considered the following nonstatutory mitigating factors: (1) Reynolds was gainfully employed at the time the crimes were committed (little weight); (2) Reynolds exhibited appropriate courtroom behavior (little weight); (3) Reynolds had a difficult childhood (little weight). The trial court found that the evidence did not establish that Reynolds had the ability to adjust easily to prison life. Additionally, the trial court refused to consider residual or lingering doubt as a nonstatutory mitigating circumstance.
The circumstances of this case are similar to other cases in which this Court has upheld the death penalty. See Butler v. State, 842 So.2d 817, 833 (Fla.2003) (holding the death sentence proportional for the first-degree murder conviction where only the HAC aggravator was found); Singleton v. State, 783 So.2d 970, 979 (Fla.2001) (holding the death sentence proportional for the first-degree murder conviction where the aggravators included prior violent felony conviction and HAC); Mansfield v. State, 758 So.2d 636, 647 (Fla.2000) (death sentence was proportionate where trial court found two aggravating factors, HAC and murder committed during the course of enumerated felony, measured against five nonstatutory factors that were given little weight); Geralds v. State, 674 So.2d 96 (Fla.1996) (death sentence was proportionate where trial court found only two aggravating circumstances, HAC and murder in course of felony, and some nonstatutory mitigation); Branch v. State, 685 So.2d 1250, 1253 (Fla.1996) (holding death sentence proportional in a case where the aggravators were murder committed during the course of enumerated felony, prior violent felony, and HAC, and the following nonstatutory mitigating factors were found: remorse, unstable childhood, positive personality traits, and acceptable conduct at trial). Comparing the circumstances in this action to the cases cited above and other capital cases, we hold that Reynolds' sentence is proportional in relation to other death sentences that this Court has upheld.

III. CONCLUSION
Having heard oral argument and considered each of the issues raised in this direct appeal, we affirm the judgment and sentences of death.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] Neiner v. State, 875 So.2d 699 (Fla. 4th DCA 2004), also cited by Reynolds in support of this claim, is likewise inapposite. The district court in Neiner merely held that the trial court incorrectly analyzed and excluded relevant evidence under the hearsay exception for the absence of entry in records of regularly conducted activity. See id. at 699. The decision did not even address the issue presented herewhether a defendant's constitutional rights require the admission of hearsay statements even though the laws of evidence call for their exclusion.
[3] Spencer v. State, 615 So.2d 688 (Fla.1993).
[4] Reynolds reasserts his claim regarding the penalty phase testimony of Tonya Chapple, the victim of one of Reynolds' prior violent felony convictions. This issue was analyzed in detail and rejected above. See discussion supra pp. 1148-50.