# SUPREME COURT OF THE UNITED STATES

## MICHAEL GORDON REYNOLDS *v.* FLORIDA

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 18–5181. Decided November 13, 2018

The petition for a writ of certiorari is denied.

Statement of JUSTICE BREYER respecting the denial of certiorari.

This case, along with 83 others in which the Court has denied certiorari in recent weeks, asks us to decide whether the Florida Supreme Court erred in its application of this Court's decision in *Hurst* v. *Florida*, 577 U. S. ___ (2016). In *Hurst*, this Court concluded that Florida's death penalty scheme violated the Constitution because it required a judge rather than a jury to find the aggravating circumstances necessary to impose a death sentence. The Florida Supreme Court now applies *Hurst* retroactively to capital defendants whose sentences became final after this Court's earlier decision in *Ring* v. *Arizona*, 536 U. S. 584 (2002), which similarly held that the death penalty scheme of a different State, Arizona, violated the Constitution because it required a judge rather than a jury to find the aggravating circumstances necessary to impose a death sentence. The Florida Supreme Court has declined, however, to apply *Hurst* retroactively to capital defendants whose sentences became final before *Ring*. *Hitchcock* v. *State*, 226 So. 3d 216, 217 (2017). As a result, capital defendants whose sentences became final before 2002 cannot prevail on a "*Hurst*-is-retroactive" claim.

Many of the Florida death penalty cases in which we have denied certiorari in recent weeks involve—directly or indirectly—three important issues regarding the death penalty as it is currently administered. *First*, these cases highlight what I have previously described as a serious flaw in the death penalty system: the unconscionably long

delays that capital defendants must endure as they await execution. Henry Sireci, the petitioner in one case we recently denied, was first sentenced to death in 1976. He has lived in prison under threat of execution for nearly 42 years. Unfortunately, Sireci is far from alone in having endured lengthy delays. The Court has recently denied petitions from at least 10 other capital defendants in Florida who have lived under a death sentence for more than 30 years, and from at least 50 other capital defendants who have lived under a death sentence for more than 20 years. I have previously written that lengthy delays—made inevitable by the Constitution's procedural protections for defendants facing execution—deepen the cruelty of the death penalty and undermine its penological rationale. *Glossip* v. *Gross*, 576 U. S. ___, ___ (2015) (dissenting opinion) (slip op., at 19); see *Dunn* v. *Madison*, 583 U. S. ___, ___ (2017) (concurring opinion) (slip op., at 2); *Smith* v. *Ryan*, 581 U. S. ___, ___ (2017) (statement respecting denial of certiorari) (slip op., at 1); *Sireci* v. *Florida*, 580 U. S. ___, ___ (2016) (opinion dissenting from denial of certiorari) (slip op., at 1). I remain of that view. However, because the petitioners in these cases did not squarely raise the delay issue, I do not vote to grant certiorari on that basis here.

*Second*, many of these cases raise the question whether the Constitution demands that *Hurst* be made retroactive to all cases on collateral review, not just to cases involving death sentences that became final after *Ring*. I believe the retroactivity analysis here is not significantly different from our analysis in *Schriro* v. *Summerlin*, 542 U. S. 348 (2004), where we held that *Ring* does not apply retroactively. Although I dissented in *Schriro*, I am bound by the majority's holding in that case. I therefore do not dissent on that ground here.

*Third*, several of the cases in which we deny certiorari today, including this one, indirectly raise the question

whether the Eighth Amendment requires a jury rather than a judge to make the ultimate decision to sentence a defendant to death. See *Guardado* v. *Florida*, No. 17–9284; *Philmore* v. *Florida*, No. 17–9556; *Tanzi* v. *Florida*, No. 18–5160; *Franklin* v. *Florida*, No. 18–5228; *Grim* v. *Florida*, No. 18–5518; *Johnston* v. *Florida*, No. 18–5793. In these cases, the Florida Supreme Court treated *Hurst* errors as harmless in significant part because the jury in each case unanimously recommended that the defendant be sentenced to death. The problem, however, is that the defendants in these cases were sentenced to death under a scheme that required the judge to make the ultimate decision to impose the death penalty, and in which the jury was repeatedly instructed that its recommended verdict would be advisory. As I have previously written, I believe that this scheme violates the Eighth Amendment. See *Middleton* v. *Florida*, 583 U. S. \_\_\_, \_\_\_ (2018) (opinion dissenting from denial of certiorari) (slip op., at 1); *Hurst*, *supra*, at \_\_\_ (opinion concurring in judgment) (slip op., at 1); *Ring*, *supra*, at 619 (same). Because juries are better suited than judges to "express the conscience of the community on the ultimate question of life or death," the Constitution demands that jurors make, and take responsibility for, the ultimate decision to impose a death sentence. *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968).

Although these cases do not squarely present the general question whether the Eighth Amendment requires jury sentencing, they do present a closely related question: whether the Florida Supreme Court's harmless-error analysis violates the Eighth Amendment because it "rest[s] a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell* v. *Mississippi*, 472 U. S. 320, 328–329 (1985). For the reasons set out in JUSTICE SOTOMAYOR's dissent, *post*, at 3–7, I believe the Court

should grant certiorari on that question in an appropriate case. That said, I would not grant certiorari on that question here. In many of these cases, the Florida Supreme Court did not fully consider that question, or the defendants may not have properly raised it. That may ultimately impede, or at least complicate, our review.

Nonetheless, the three issues raised by these cases draw into focus a more basic point I made in *Schriro*: A death sentence should reflect a jury's "community-based judgment that the sentence constitutes proper retribution." 542 U. S., at 360 (dissenting opinion). It seems to me that the jurors in at least some of these cases might not have made a "community-based judgment" that a death sentence was "proper retribution" had they known at the time of sentencing (1) that the death penalty might not be administered for another 40 years or more; (2) that other defendants who were sentenced years later would be entitled to resentencing based on a later-discovered error, but that the defendants in question would not be entitled to the same remedy for roughly the same error; or (3) that the jury's death recommendation would be treated as if it were decisive, despite the judge's instruction that the jury's recommendation was merely advisory. Had jurors known about these issues at the time of sentencing, some might have hesitated before recommending a death sentence. At least a few might have recommended a life sentence instead. The result is that some defendants who have lived under threat of execution for decades might never have been sentenced to death in the first place.

The flaws in the current practice of capital punishment could often cast serious doubt on the death sentences imposed in these and other capital cases. Rather than attempting to address the flaws in piecemeal fashion, however, I remain of the view that "it would be wiser to reconsider the root cause of the problem—the constitutionality of the death penalty itself." *Madison*, *supra*, at ___ (BREYER, J., concurring) (slip op., at 3).

# SUPREME COURT OF THE UNITED STATES

## MICHAEL GORDON REYNOLDS *v.* FLORIDA

### ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 18–5181.   Decided November 13, 2018

JUSTICE THOMAS, concurring in denial of certiorari.

On the night of July 21, 1998, petitioner Michael Gordon Reynolds murdered nearly an entire family. While the father, Danny Ray Privett, relieved himself outside the family's camping trailer, petitioner snuck up behind him and "viciously and deliberately battered [his] skull with a piece of concrete." *Reynolds* v. *State*, 934 So. 2d 1128, 1157 (Fla. 2006) (*Reynolds I*). Petitioner would later explain: "'[W]ith my record'"—which included aggravated robbery, aggravated assault, and aggravated battery—"'I couldn't afford to leave any witnesses.'" *Id.,* at 1149, 1157. So petitioner entered the trailer, where he brutally beat, stabbed, and murdered Privett's girlfriend, Robin Razor, and their 11-year-old daughter, Christina Razor. Robin "suffered multiple stab wounds along with multiple blows to the side of her face and a broken neck resulting in injuries to her spinal cord." *Id.,* at 1136. She desperately fought back, suffering "significant defensive wounds" and "torment wounds"—shallow slashes that occur when "the perpetrator tak[es] a depraved, measured approach to the infliction of the injury and tak[es] pleasure in his cruel activity." *Id.,* at 1136, 1153. Eleven-year-old Christina also resisted, suffering "blunt force trauma to her head, a stab wound to the base of her neck that pierced her heart, and another stab wound to her right shoulder that pierced her lung and lacerated her pulmonary artery." *Id.,* at 1136. Only petitioner knows whether Robin had to watch her daughter die, or whether Christina had to watch her mother die. "Regardless, in the close confines of that

cramped camping trailer, Christina Razor, in great pain and fear, was forced to fight a losing battle for her life knowing that either her mother had already been killed and she was next or that after Reynolds killed her, he was sure to end her mother's life." *Id.,* at 1154. "For a child to experience the fear, terror and emotional strain that accompanied Christina Razor as she fought for her life, knowing full well that she was fighting a losing battle, is unimaginable, heinous, atrocious and cruel." *Ibid.* "Christina was found not wearing any underwear," and petitioner's DNA was matched to both a pubic hair and Christina's underwear, both found near her body. *Reynolds* v. *State*, 99 So. 3d 459, 487–488, 501 (Fla. 2012). The sole surviving family member, Danielle, "was spared only because she was spending the night with a friend." Stutzman, Judge Gives Killer Death Sentence, Orlando Sentinel, Sept. 20, 2003, p. B7, col. 1. Danielle was devastated; "she wished she'd been home that night" to "f[ight] the attacker and tr[y] to save her sister and parents" or "di[e] alongside them." *Ibid.*

JUSTICE BREYER worries that the jurors here "might not have made a 'community-based judgment' that a death sentence was 'proper retribution' had they known" of his concerns with the death penalty. *Ante,* at 4 (statement respecting denial of certiorari). In light of petitioner's actions, I have no such worry, and I write separately to alleviate JUSTICE BREYER's concerns.*

---

*JUSTICE BREYER cites several other cases in which we have denied certiorari today. *Ante,* at 3. He need not worry about the jury's decisions in those cases either. In *Guardado* v. *Florida,* No. 17–9284, petitioner, in need of money to "continue his recent crack cocaine binge," went to the home of a 75-year-old woman who had given him repeated assistance, struck her over and over with a "'breaker bar,'" and when "'she would not die,'" "pulled [a] kitchen knife and stabbed her several times, then slashed her throat." *Guardado* v. *State*, 965 So. 2d 108, 110–111 (Fla. 2007). In *Philmore* v. *Florida,* No. 17–9556, petitioner, in need of a getaway car for a planned bank robbery, asked

JUSTICE BREYER's first concern is "that the death penalty might not be administered for another 40 years or more" after the jury's verdict. *Ante,* at 4. That is a reason to carry out the death penalty sooner, not to decline to impose it. In any event, petitioner evidently is not bothered by delay. Petitioner has litigated all the way through the state courts and petitioned this Court for review three separate times. He can avoid "endur[ing]" an "unconscionably long dela[y]," *ante,* at 1–2, "by submitting to what the people of Florida have deemed him to deserve: execution." *Foster* v. *Florida*, 537 U. S. 990, 991 (2002) (THOMAS, J., concurring in denial of certiorari). "It makes 'a mockery of our system of justice for a convicted murderer, who, through his own interminable efforts of delay has secured the almost-indefinite postponement of his sentence, to then claim that the almost-indefinite postpone-

_____

the victim if he could use her phone, then pushed himself into her car, drove her to "an isolated area," "ordered her to walk towards high vegetation," and "shot her once in the head." *Philmore* v. *State*, 820 So. 2d 919, 923–924 (Fla. 2002). In *Tanzi* v. *Florida,* No. 18–5160, petitioner carjacked his victim by "punch[ing] her in the face until he gained entry," "forced [her] to perform oral sex," then "told [her] that he was going to kill her," put "duct tape over her mouth, nose, and eyes," and "strangle[d her] until she died." *Tanzi* v. *State*, 964 So. 2d 106, 110–111 (Fla. 2007). In *Franklin* v. *Florida*, No. 18–5228, petitioner stole a woman's car after invading her home and bashing her on the head with a hammer (leaving her "unable to live on her own"), asked a security guard at a local store for driving directions, bragged that he was going to come back and "'get'" the guard, and did just that, shooting the guard once in the back. *Franklin* v. *State*, 965 So. 2d 79, 84 (Fla. 2007). In *Grim* v. *Florida*, No. 18–5518, petitioner invited his neighbor over for coffee and then "repeatedly attacked [her] with a hammer, stabbed [her] multiple times," "forcefully inserted [an object] into her vagina," and dumped her body in Pensacola Bay. *Grim* v. *State*, 971 So. 2d 85, 89–90, 93 (Fla. 2007). Finally, in *Johnston* v. *Florida*, No. 18–5793, petitioner kidnaped his victim, "bea[t], raped, and manually strangled [her], then dragged her to a pond and left her nude, floating face down." *Johnston* v. *State*, 63 So. 3d 730, 735 (Fla. 2011).

ment renders his sentence unconstitutional.'" *Thompson*
v. *McNeil*, 556 U. S. 1114, 1117 (2009) (THOMAS, J., con-
curring in denial of certiorari) (alterations omitted) (quot-
ing *Turner* v. *Jabe*, 58 F. 3d 924, 933 (CA4 1995) (Luttig,
J., concurring in judgment)).

It is no mystery why it often takes decades to execute a
convicted murderer.   The "labyrinthine restrictions on
capital punishmen[t] promulgated by this Court" have
caused the delays that JUSTICE BREYER now bemoans.
*Glossip* v. *Gross*, 576 U. S. ___, ___ (2015) (Scalia, J., con-
curring) (slip op., at 6); see *Knight* v. *Florida*, 528 U. S. 990,
991 (1999) (THOMAS, J., concurring in denial of certiorari).
As "the Drum Major in this parade" of new precedents,
JUSTICE BREYER is not well positioned to complain about
their inevitable consequences.   *Glossip*, *supra,* at ___
(Scalia, J., concurring) (slip op., at 6).

JUSTICE BREYER's second concern is that petitioner's
jury might have declined to impose the death penalty if it
had known that other capital defendants "would be enti-
tled to resentencing," while petitioner himself would not
be resentenced.  *Ante,* at 4.  What this has to do with the
original jury's judgment as to "'proper retribution,'" *ibid.*,
is beyond me.   Petitioner murdered Danielle Privett's
entire family.   Whether he deserves to be sentenced to
death has nothing to do with whether a different person
who engaged in different conduct might be entitled to be
resentenced on procedural grounds.   Moreover, if peti-
tioner *had* been resentenced, and was again sentenced to
death, I have little doubt that JUSTICE BREYER would
instead be fretting that the original jury failed to consider
his belief that resentencing "sharpen[s]" "[d]eath row's
inevitable anxieties and uncertainties."  *Foster*, *supra,* at
993 (opinion dissenting from denial of certiorari).

JUSTICE BREYER's third concern is that petitioner was
"sentenced to death under a scheme that required the
judge to make the ultimate decision to impose the death

penalty, and in which the jury was repeatedly instructed that its recommended verdict would be advisory." *Ante,* at 3. Once again, petitioner did not share JUSTICE BREYER's concern. "After thorough consultation with his attorneys and the trial court," petitioner waived "his right to a jury's penalty recommendation as to the appropriate sentence" and "waived the presentation of mitigating evidence before the penalty phase jury." *Reynolds I*, 934 So. 2d, at 1138, 1148. When the trial court did not allow petitioner to waive the jury's involvement, petitioner appealed, arguing that "the trial court abused its discretion and committed reversible error when it refused to honor" his waiver. *Id.,* at 1147–1148.

Contrary to JUSTICE BREYER's suggestion that the jury did not feel an adequate sense of "responsibility" for its recommendation, *ante,* at 3, the jury was instructed that a "'human life is at stake'" and that the trial court could reject the jury's recommendation "'only if the facts [are] so clear and convincing that virtually no reasonable person could differ.'" 251 So. 3d 811, 813, 828 (Fla. 2018) (*per curiam*). The jury was further instructed that its recommendation did not need to be unanimous. *Id.,* at 815. Nonetheless, the jury returned not one but two unanimous death recommendations. *Ibid.*

JUSTICE BREYER's final (and actual) concern is with the "'death penalty itself.'" *Ante,* at 4. As I have elsewhere explained, "it is clear that the Eighth Amendment does not prohibit the death penalty." *Baze* v. *Rees*, 553 U. S 35, 94 (2008) (opinion concurring in judgment); see *Glossip*, *supra,* at \_\_\_–\_\_\_, and n. 1 (THOMAS, J., concurring) (slip op., at 1–2, and n. 1). The only thing "cruel and unusual" in this case was petitioner's brutal murder of three innocent victims.

# SUPREME COURT OF THE UNITED STATES

## MICHAEL GORDON REYNOLDS *v.* FLORIDA

ON PETITION FOR WRIT OF CERTIORARI TO THE
SUPREME COURT OF FLORIDA

No. 18–5181.   Decided November 13, 2018

JUSTICE SOTOMAYOR, dissenting from denial of certiorari.

Today, this Court denies the petitions of seven capital defendants, each of whom was sentenced to death under a capital sentencing scheme that this Court has since declared unconstitutional.[1]  The Florida Supreme Court has left the petitioners' death sentences undisturbed, reasoning that any sentencing error in their cases was harmless. Petitioners challenge the Florida Supreme Court's analysis because it treats the fact of unanimous jury recommendations in their cases as highly significant, or legally dispositive, even though those juries were told repeatedly that their verdicts were merely advisory.  I have dissented before from this Court's failure to intervene on this issue.[2] Petitioners' constitutional claim is substantial and affects numerous capital defendants.  The consequence of error in these cases is too severe to leave petitioners' challenges

————————

[1] In addition to Reynolds' petition, this Court denies the petitions of Jesse Guardado, No. 17–9284; Lenard James Philmore, No. 17–9556; Michael Anthony Tanzi, No. 18–5160; Quawn M. Franklin, No. 18–5228; Norman Mearle Grim, No. 18–5518; and Ray Lamar Johnston, No. 18–5793.  For the reasons expressed herein, I respectfully dissent from denial of certiorari in their cases as well.

[2] I thrice dissented because the Florida Supreme Court had failed even to address the significant constitutional question the petitioners raised.  See *Guardado* v. *Jones*, 584 U. S. ___ (2018) (opinion dissenting from denial of certiorari); *Middleton* v. *Florida*, 583 U. S. ___ (2018) (same); *Truehill* v. *Florida*, 583 U. S. ___ (2017) (same).  I dissented again after the Florida Supreme Court ultimately did take up the question, and I noted the need for a definitive resolution of the issue. *Kaczmar* v. *Florida*, 585 U. S. ___ (2018) (same).

unanswered, and I therefore would grant the petitions.

## I

I begin by acknowledging that petitioners have been convicted of gruesome crimes. Their victims, and the families and communities of those victims, have suffered. I am cognizant of their suffering. I am also mindful that it is this Court's duty to ensure that all defendants, even those who have committed the most heinous crimes, receive a sentence that is the result of a fair process. It is with that responsibility in mind that I analyze the petitioners' challenges.

## II

Like the petitioners described in my prior dissents, each petitioner here was sentenced pursuant to Florida's former sentencing scheme. That regime involved an evidentiary hearing before a jury, after which the jury would issue an advisory sentence for life or death. See *Hurst* v. *Florida*, 577 U. S. ___, ___–___ (2016) (slip op., at 2–3). Next, the judge independently decided whether aggravating and mitigating factors existed, weighed those factors, and entered a sentence of life or death. *Id.,* at ___ (slip op., at 3). In *Hurst*, this Court held that Florida's scheme violated the Sixth Amendment because it impermissibly allowed a judge to increase the punishment authorized for a defendant "based on her own factfinding." *Id.,* at ___ (slip op., at 6).

Petitioners sought relief from the Florida courts after *Hurst* was decided. Although the Florida Supreme Court assumed that *Hurst* errors had occurred in petitioners' cases, it concluded that any such errors were harmless—in other words, there was "no reasonable possibility" that the errors affected petitioners' sentences. 251 So. 3d 811, 815 (Fla. 2018) (*per curiam*) (case below).

In theory, the Florida Supreme Court's harmless-error

analysis turns on an individualized review of each case. See *id.,* at 816. And, indeed, in some cases the Florida Supreme Court has considered several factors in its harmless-error analysis. See *Davis* v. *State,* 207 So. 3d 142, 174–175 (2016) (referring to the unanimity of the jury recommendations of death as well as the "egregious facts" of the case). In practice, however, the Florida Supreme Court's harmless-error approach appears to reflect a myopic focus on one factor: whether the advisory jury's recommendation for death was unanimous. Because the jurors in pre-*Hurst* cases were informed that they should recommend death only if they determined that sufficient aggravating factors existed and outweighed the mitigating factors, the Florida Supreme Court has reasoned that a jury that unanimously recommended death necessarily made the findings that *Hurst* said are constitutionally required. See *Davis*, 207 So. 3d, at 174–175. By concluding that *Hurst* violations are harmless because jury recommendations were unanimous, the Florida Supreme Court "transforms those advisory jury recommendations into binding findings of fact." *Guardado* v. *Jones*, 584 U. S. ___, ___ (2018) (SOTOMAYOR, J., dissenting from denial of certiorari) (slip op., at 5).

### III
### A

Because the Florida Supreme Court's harmless-error analysis relies heavily on the fact that a purely advisory jury rendered a unanimous decision, it raises serious questions under this Court's precedents.

In *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), this Court said it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.,* at 328–329. *Caldwell* involved misleading comments by a prosecutor who emphasized

that the jury's verdict would be subject to appellate review. See *id.,* at 336. This Court concluded that the resulting sentence did not satisfy the minimum standard of reliability required by the Eighth Amendment because the prosecutor's suggestions created "an intolerable danger" that the jury would "minimize the importance of its role." *Id.,* at 333. *Caldwell* explained that this Court has "always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.'" *Id.,* at 341. Where a sentencing jury is encouraged to proceed without that awareness, *Caldwell* suggests that "there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences." *Id.,* at 330.

As noted above, the sentencing scheme in place in Florida when petitioners were sentenced placed the final responsibility with the trial judge. Juries were instructed accordingly. Thus although the jury in this case was instructed that the court would reject a recommendation "only if the facts [we]re so clear and convincing that virtually no reasonable person could differ" and that a "human life [wa]s at stake," the jury also was told that its duty was to "advise the court" and that "the final decision as to what punishment shall be imposed [wa]s the responsibility of the judge." App. D to Pet. for Cert. The jury also heard, repeatedly, that it was to "recommend" an "advisory sentence." *Ibid.* Jury instructions varied across cases. For example, the jurors in petitioner Jesse Guardado's case heard that "human life [wa]s at stake," but not that the court would reject the jury's recommendation only in limited circumstances. App. to Pet. for Cert. in *Guardado* v. *Florida*, O. T. 2018, No. 17–9284, pp. 92a–105a. Like the jurors in this case, the jurors in Guardado's case were instructed that it was their responsibility to "advise the Court" as to the appropriate punishment. *Id.,* at 92a. The

court further instructed jurors that the "[f]inal decision as to what punishment shall be imposed rest[ed] solely with the judge of th[e] court." *Ibid.* These jurors knew that the final decision as to whether Guardado would live or die did not rest with them. The Court's reasoning in *Caldwell* informs how much weight, if any, to give such a purely advisory recommendation for death.

## B

In the case below, the Florida Supreme Court addressed the *Caldwell* issue at length. See 251 So. 3d, at 814–828.[3] Two aspects of the plurality's analysis show the need for further engagement with this issue.

First, the Florida Supreme Court said that its application of the harmless-error rule does not entirely turn on jury unanimity. See *id.*, at 816 ("a unanimous recommendation is not sufficient alone" to find harmlessness). To be sure, in some cases the Florida Supreme Court has mentioned factors other than unanimity to support a finding of harmlessness. See, *e.g., Philmore* v. *Florida*, 234 So. 3d 567, 568 (2018), cert. denied, *supra*, p. \_\_\_ (noting that the defendant's confession and the aggravation in the case, as well as the jury's unanimous recommendation, supported a finding of harmlessness). But in many other cases, the court's analysis started and ended with the unanimity of the jury's recommendation. Indeed, on the very day that the Florida Supreme Court decided this case, it treated jury unanimity as dispositive in four other capital cases.[4]

––––––––––

[3] Of the seven justices of the Florida Supreme Court, only two justices concurred in the court's *per curiam* opinion and one justice concurred specially with an opinion. Of the remaining four justices, two dissented and two concurred only in the result.

[4] See *Tanzi* v. *State*, 251 So. 3d 805, 806 (2018), cert. denied, *supra*, p. \_\_\_ (citing *Davis* v. *State,* 207 So. 3d 142, 175 (2016), for the proposition that the unanimity of a jury's recommendation for death ensures that jurors have made the necessary findings of fact); *Johnston* v. *State*, 246 So. 3d 266 (2018), cert. denied, *supra*, p. \_\_\_ ("Johnston received a

In a recent opinion, the Florida Supreme Court again stated that it "has consistently . . . den[ied] *Hurst* relief to defendants who have received a unanimous jury recommendation of death." *Anderson* v. *State*, ___ So. 3d ___, ___, 2018 WL 4784075, *1 (Oct. 4, 2018) (internal quotation marks omitted). To the extent the Florida Supreme Court gives dispositive weight to the fact that an advisory jury offered a unanimous recommendation, that action implicates the Eighth Amendment concerns that *Caldwell* addressed.

Second, the state court dismissed *Caldwell* as inapplicable to cases like petitioners' because the pre-*Hurst* jury instructions accurately described the advisory role assigned to the jury by state law at that time. 251 So. 3d, at 824–825. It is true that *Caldwell*'s holding invalidates only those sentences imposed following comments that "*mislead* the jury as to its role in the sentencing process." *Romano* v. *Oklahoma*, 512 U. S. 1, 9 (1994) (internal quotation marks omitted; emphasis added). But whether or not *Caldwell* itself makes the petitioners' sentences unconstitutional, the reasoning in *Caldwell* surely informs the related question whether a purely advisory jury recommendation is sufficiently reliable for a court to treat it as legally dispositive for purposes of harmless-error review. *Caldwell* provides strong reasons to doubt that a jury would have reached the same decision had it been instructed that its role was not advisory. See 251 So. 3d, at 832 (Pariente, J., dissenting) ("[T]he jury [in Reynolds'

—————

unanimous jury recommendation of death and, therefore, the *Hurst* error in this case is harmless beyond a reasonable doubt"); *Crain* v. *State*, 246 So. 3d 206, 210 (2018) ("[T]his Court can rely on the jury's unanimous recommendation for death to conclude that the *Hurst* error in Crain's case was harmless beyond a reasonable doubt"); *Taylor* v. *State*, 246 So. 3d 204, 206 (2018) ("[T]his Court has consistently relied on *Davis* to deny *Hurst* relief to defendants who have received unanimous jury recommendations of death").

case] was repeatedly told that its sentencing recommendation between life and death was merely 'advisory.' . . . I would conclude that *Caldwell* further supports the conclusion that the *Hurst* error in Reynolds' case is not harmless beyond a reasonable doubt").

## IV

"[T]his Court's Eighth Amendment jurisprudence has taken as a given that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State." *Caldwell*, 472 U. S., at 329. The jurors in petitioners' cases were repeatedly instructed that their role was merely advisory, yet the Florida Supreme Court has treated their recommendations as legally binding by way of its harmless-error analysis. This approach raises substantial Eighth Amendment concerns. As I continue to believe that "the stakes in capital cases are too high to ignore such constitutional challenges," *Truehill* v. *Florida*, 583 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 2), I would grant review to decide whether the Florida Supreme Court's harmless-error approach is valid in light of *Caldwell*. This Court's refusal to address petitioners' challenges signals that it is unwilling to decide this issue. I respectfully dissent from the denial of certiorari, and I will continue to note my dissent in future cases raising the *Caldwell* question.