Justice KAVANAUGH, concurring.
When an inmate raises an as-applied constitutional challenge to a particular method of execution-that is, a challenge to a method of execution that is constitutional in general but that the inmate says is very likely to cause him severe pain-one question is whether the inmate must identify an available alternative method of execution that would significantly reduce the risk of severe pain. Applying our recent decisions in Glossip v. Gross , 576 U.S. ----, 135 S.Ct. 2726, 192 L.Ed.2d 761 (2015), and Baze v. Rees , 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality *1136 opinion), the Court's answer to that question is yes. Under those precedents, I agree with the Court's holding and join the Court's opinion.
I write to underscore the Court's additional holding that the alternative method of execution need not be authorized under current state law-a legal issue that had been uncertain before today's decision. See Arthur v. Dunn , 580 U.S. ----, ---- - ----, 137 S.Ct. 725, 729-731, 197 L.Ed.2d 225 (2017) (SOTOMAYOR, J., dissenting from denial of certiorari). Importantly, all nine Justices today agree on that point. Ante , at 1143; post , at 1128 (BREYER, J., dissenting).
As the Court notes, it follows from that additional holding that the burden of the alternative-method requirement "can be overstated." Ante , at 1128. Indeed, the Court states: "[W]e see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative." Ante , at 1128 - 1129.
In other words, an inmate who contends that a particular method of execution is very likely to cause him severe pain should ordinarily be able to plead some alternative method of execution that would significantly reduce the risk of severe pain. At oral argument in this Court, the State suggested that the firing squad would be such an available alternative, if adequately pleaded. Tr. of Oral Arg. 63-64 ("He can plead firing squad.... Of course, if he had ... pleaded firing squad, it's possible that Missouri could have executed him by firing squad"). Justice SOTOMAYOR has likewise explained that the firing squad is an alternative method of execution that generally causes an immediate and certain death, with close to zero risk of a botched execution. See Arthur , 580 U.S., at ---- - ----, 137 S.Ct., at 733-734. I do not here prejudge the question whether the firing squad, or any other alternative method of execution, would be a feasible and readily implemented alternative for every State. See McGehee v. Hutchinson , 854 F.3d 488, 493-494 (CA8 2017). Rather, I simply emphasize the Court's statement that "we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative." Ante , at 1128 - 1129.
Justice BREYER, with whom Justice GINSBURG, Justice SOTOMAYOR, and Justice KAGAN join as to all but Part III, dissenting.
The Court's decision in this case raises three questions. The first is primarily a factual question, namely, whether Bucklew has established genuine issues of material fact concerning whether executing him by lethal injection would cause him excessive suffering. The second is primarily a legal question, namely, whether a prisoner like Bucklew with a rare medical condition must identify an alternative method by which the State may execute him. And the third is a more general question, namely, how to minimize delays in executing offenders who have been condemned to death.
I disagree with the majority's answers to all three questions. Bucklew cites evidence that executing him by lethal injection will cause the tumors that grow in his throat to rupture during his execution, causing him to sputter, choke, and suffocate on his own blood for up to several minutes before he dies. That evidence establishes at this stage of the proceedings that executing Bucklew by lethal injection risks subjecting him to constitutionally impermissible suffering. The majority holds that the State may execute him anyway. In my view, that holding violates the clear command of the Eighth Amendment.
*1137 I
I begin with a factual question: whether Bucklew has established that, because of his rare medical condition, the State's current method of execution risks subjecting him to excessive suffering. See Glossip v. Gross , 576 U.S. ----, ----, 135 S.Ct. 2726, 2737, 192 L.Ed.2d 761 (2015) (requiring "a demonstrated risk of severe pain"); see also Baze v. Rees , 553 U.S. 35, 50, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality opinion) (requiring "a substantial risk of serious harm" (internal quotation marks omitted)).
There is no dispute as to the applicable summary judgment standard. Because the State moved for summary judgment, it can prevail if, but only if, it "shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. Proc. 56(a) ; see also Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On review, we examine the record as a whole, which includes "depositions, documents, [and] affidavits or declarations." Rule 56(c). And we must construe the evidence in the light most favorable to Bucklew and draw every justifiable inference in his favor. See Tolan v. Cotton , 572 U.S. 650, 651, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (per curiam ).
A
Bucklew has easily established a genuine issue of material fact regarding whether an execution by lethal injection would subject him to impermissible suffering.
The record indicates that Bucklew suffers from a congenital condition known as cavernous hemangioma that causes tumors filled with blood vessels to grow throughout his body, including in his head, face, neck, and oral cavity. The condition is rare. One study estimates that hemangiomas in the oral cavity occur in less than one percent of the population, and that hemangiomas like Bucklew's have been identified in five cases. See Wang, Chen, Mojica, & Chen, Cavernous Hemangioma of the Uvula, 8 N. Am. J. Med. & Sci. 56, 56-59 (2015).
Tumors grow out of Bucklew's lip and over his mouth, as well as on his hard and soft palates. One tumor also grows directly on Bucklew's uvula, which has become "grossly enlarged" as a result. App. 225. (The uvula is the "pendent fleshy lobe" that hangs from the back of the throat. Merriam-Webster's Collegiate Dictionary 1379 (11th ed. 2003).) Bucklew's tumors obstruct his airway and make it difficult for him to breathe. His difficulty breathing is chronic, but is particularly acute when he lies flat and gravity pulls his engorged uvula into his airway. He often has to adjust the positioning of his head to prevent his uvula from obstructing his breathing. He sleeps at a 45-degree angle to facilitate breathing, and he often wakes up in the middle of the night gasping for air.
Due to the sensitivity of his tumors, even minimal contact may cause them to hemorrhage. He has described past hemorrhages as " 'squirting' " or "leaking" blood, and he states that the first thing he does each morning is to wipe the blood off his face that leaked from his nose and mouth as he slept. Bucklew's condition is progressive and, due to the risk of significant blood loss caused by the sensitivity of his tumors, cannot be treated by surgery.
Bucklew maintains that, as a result of this medical condition, executing him by lethal injection would prove excruciatingly painful. In support of this claim, Bucklew submitted sworn declarations and deposition testimony from an expert witness, Dr. Joel Zivot, an anesthesiologist. Dr. Zivot provided extensive testimony regarding the pain that Bucklew would likely endure in an execution by lethal injection:
*1138 • Dr. Zivot testified that in light of "the degree to which Mr. Bucklew's airway is compromised by the hemangiomas" and "the particular psychological and physical effects of lethal injection, it is highly likely that Mr. Bucklew would be unable to maintain the integrity of his airway during the time after receiving the lethal injection and before death." App. 221.
• Dr. Zivot explained that, as a result of "the highly friable and fragile state of the tissue of Mr. Bucklew's mouth and airway," Bucklew "will likely experience hemorrhaging and/or the possible rupture of the tumor" on his uvula during his execution. Id ., at 222.
• Dr. Zivot added that the "hemorrhaging will further impede Mr. Bucklew's airway by filling his mouth and airway with blood, causing him to choke and cough on his own blood." Ibid .
• Dr. Zivot concluded that "it is highly likely that Mr. Bucklew, given his specific congenital medical condition, cannot undergo lethal injection without experiencing the excruciating pain and suffering" of "suffocation, convulsions, and visible hemorrhaging." Id ., at 223.
Dr. Zivot also testified about the duration of pain to which an execution by lethal injection would subject Bucklew, describing it as "prolonged." Id ., at 234.
• Dr. Zivot stated that the effects of a pentobarbital injection "are highly unlikely to be instantaneous and the period of time between receiving the injection and death could range over a few minutes to many minutes ." Id ., at 222 (emphasis added).
• Dr. Zivot "strongly disagree[d] with [the State's expert's] repeated claim that the pentobarbital injection would result in 'rapid unconsciousness.' " Id ., at 233.
• Dr. Zivot explained that Bucklew "would likely experience unconsciousness that sets in progressively as the chemical circulates through his system" and that it was during this period that Bucklew was "likely to experience prolonged feelings of suffocation and excruciating pain." Id ., at 233-234.
The State asked the District Court to grant summary judgment in its favor on the theory that Bucklew failed to identify a genuine factual issue regarding whether an execution by lethal injection would be impermissibly painful. The District Court refused. The court believed that Bucklew had adequately shown that for up to several minutes he "could be aware that he is choking or unable to breathe but be unable to 'adjust' his breathing to remedy the situation." Id ., at 827. Recognizing that the State's evidence suggested that Bucklew would experience this choking sensation for a shorter period, the District Court concluded that the dispute between the experts was "a factual dispute that the Court cannot resolve on summary judgment, and would have to be resolved at trial." Ibid.
The District Court was right. The evidence, taken in the light most favorable to Bucklew, creates a genuine factual issue as to whether Missouri's lethal injection protocol would subject him to several minutes of "severe pain and suffering," Glossip , 576 U.S., at ----, 135 S.Ct., at 2738, during which he would choke and suffocate on his own blood. In my view, executing Bucklew by forcing him to choke on his grossly enlarged uvula and suffocate on his blood would exceed "the limits of civilized standards." Kennedy v. Louisiana , 554 U.S. 407, 435, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (internal quotation marks omitted); see also Trop v. Dulles , 356 U.S. 86, 100-101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). The experts dispute whether Bucklew's execution will prove as *1139 unusually painful as he claims, but resolution of that dispute is a matter for trial.
B
The majority, while characterizing the matter as "critical," says that there is "nothing in the record to suggest that Mr. Bucklew will be capable of experiencing pain for significantly more than 20 to 30 seconds after being injected with pentobarbital." Ante , at 1133. But what about Dr. Zivot's testimony that the time between injection and death "could range over a few minutes to many minutes"? App. 222. What about Dr. Zivot's characterization of the pain involved as "prolonged"? Id. , at 234. What about Dr. Zivot's "stron[g] disagree[ment] with [the State's expert's] repeated claim that the pentobarbital injection would result in 'rapid unconsciousness' "? Id ., at 233.
The majority construes Dr. Zivot's testimony to show only that Bucklew might remain alive for several minutes after the injection, not that he will be capable of feeling pain for several minutes after the injection. Ante , at 1132 - 1133. But immediately following his prediction that the time between injection and death could range up to many minutes, Dr. Zivot stated that "beginning with the injection of the Pentobarbital solution and ending with Mr. Bucklew's death several minutes to as long as many minutes later, Mr. Bucklew would be highly likely to experience feelings of 'air hunger' and the excruciating pain of prolonged suffocation ." App. 222 (emphasis added). Dr. Zivot thus testified both that lethal injection would take up to several minutes to kill Bucklew and that Bucklew would experience excruciating pain during this period. And it is not the case, as the majority believes, that Dr. Zivot "carefully avoided claiming that Mr. Bucklew would be capable of feeling pain until he died," ante , at 1133, particularly given that the record must be construed in the light most favorable to Bucklew.
The majority also justifies its refusal to credit Dr. Zivot's testimony on the ground that Dr. Zivot gave a response during his deposition suggesting that he misinterpreted a study of euthanasia in horses. Ante , at 1132 - 1133. Bucklew's expert, however, did not rely exclusively or even heavily upon that study; he mentioned it only in response to a question posed in his deposition. To the contrary, Dr. Zivot explained that his testimony regarding the pain to which Bucklew would be subjected was "supported both by [his] own professional knowledge of how chemicals of this type are likely to exert their effects in the body as well as by the terms of Missouri's Execution Procedure." App. 222.
Whether any mistake about the importance of a single study makes all the difference to Bucklew's case is a matter not for this Court to decide at summary judgment, but for the factfinder to resolve at trial. As Judge Colloton pointed out in dissent below, attacks on the "reliability and credibility of Dr. Zivot's opinion," including "his possible misreading of the horse study on which he partially relied," give rise to factual disputes. See 883 F.3d 1087, 1099 (CA8 2018). Judge Colloton therefore concluded that "[t]he district court did not err in concluding that it could not resolve the dispute between the experts on summary judgment." Ibid. I agree.
II
This case next presents a legal question. The Court in Glossip held in the context of a facial challenge to a State's execution protocol that the plaintiffs were required not only to establish that the execution method gave rise to a "demonstrated risk of severe pain," but also to identify a "known and available" alternative method.
*1140 576 U.S., at ----, 135 S.Ct., at 2737-2738. The Court added that the alternative must be "feasible, readily implemented, and in fact significantly reduc[e] a substantial risk of severe pain." Id., at ---- - ----, 135 S.Ct., at 2737 (internal quotation marks omitted).
I joined the dissent in Glossip , but for present purposes I accept the Glossip majority opinion as governing. I nonetheless do not believe its "alternative method" requirement applies in this case. We "often read general language in judicial opinion[s] as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." Illinois v. Lidster , 540 U.S. 419, 424, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004). And while I acknowledge that the Court in Glossip spoke in unqualified terms, the circumstances in Glossip were indeed "different" in relevant respects from the circumstances presented here.
A
The plaintiffs in Glossip undertook an across-the-board attack against the use of a particular execution method, which they maintained violated the Eighth Amendment categorically. In this case, by contrast, Bucklew does not attack Missouri's lethal injection protocol categorically, or even in respect to any execution other than his own. Instead, he maintains that he is special; that he suffers from a nearly unique illness; and that, by virtue of that illness, Missouri's execution method will be excruciatingly painful for him even though it would not affect others in the same way. These differences make a difference.
First , these differences show that the reasons that underlie Glossip 's "alternative method" requirement do not apply here.
The Glossip Court stressed the importance of preventing method-of-execution challenges from becoming a backdoor means to abolish capital punishment in general. The Court wrote that "because it is settled that capital punishment is constitutional, it necessarily follows that there must be a constitutional means of carrying it out." Glossip , 576 U.S., at ----, 135 S.Ct., at 2732-2733 (alterations omitted). The Court added that "we have time and again reaffirmed that capital punishment is not per se unconstitutional." Id. , at ----, 135 S.Ct., at 2739. And the Court feared that allowing prisoners to invalidate a State's method of execution without identifying an alternative would "effectively overrule these decisions." Ibid. But there is no such risk here. Holding Missouri's lethal injection protocol unconstitutional as applied to Bucklew-who has a condition that has been identified in only five people, see supra, at 1137 - 1138-would not risk invalidating the death penalty in Missouri. And, because the State would remain free to execute prisoners by other permissible means, declining to extend Glossip 's "alternative method" requirement in this context would be unlikely to exempt Bucklew or any other prisoner from the death penalty. Even in the unlikely event that the State could not identify a permissible alternative in a particular case, it would be perverse to treat that as a reason to execute a prisoner by the method he has shown to involve excessive suffering.
The Glossip Court, in adopting the "alternative method" requirement, relied on THE CHIEF JUSTICE's plurality opinion in Baze , which discussed the need to avoid "intrud[ing] on the role of state legislatures in implementing their execution procedures." 553 U.S. at 51, 128 S.Ct. 1520 ; see also ante , at 1125 (we owe "a measure of deference to a State's choice of execution procedures" (internal quotation marks omitted)). But no such intrusion problem exists in a case like this one.
*1141 When adopting a method of execution, a state legislature will rarely consider the method's application to an individual who, like Bucklew, suffers from a rare disease. It is impossible to believe that Missouri's legislature, when adopting lethal injection, considered the possibility that it would cause prisoners to choke on their own blood for up to several minutes before they die. Exempting a prisoner from the State's chosen method of execution in these circumstances does not interfere with any legislative judgment.
The Court in Glossip may have also believed that the identification of a permissible alternative method of execution would provide a reference point to assist in determining how much pain in an execution is too much pain. See 576 U.S., at ---- - ----, 135 S.Ct., at 2737-2738 ; Baze , 553 U.S. at 47, 51, 128 S.Ct. 1520 (plurality opinion); see also ante , at 1126 (arguing that determining the constitutionality of a method of execution "is a necessarily comparative exercise"). But there is no need for any such reference point in a case like this. Bucklew accepts the constitutionality of Missouri's chosen execution method as to prisoners who do not share his medical condition. See Brief for Petitioner 36. We are informed that this method has been used in 20 executions, apparently without subjecting prisoners to undue pain. See Brief for Respondents 5. To the extent that any comparator is needed, those executions provide a readymade, built-in comparator against which a court can measure the degree of excessive pain Bucklew will suffer.
Second , precedent counsels against extending Glossip . Neither this Court's oldest method-of-execution case, Wilkerson v. Utah , 99 U.S. 130, 25 L.Ed. 345 (1879), nor any subsequent decision of this Court until Glossip , held that prisoners who challenge a State's method of execution must identify an alternative means by which the State may execute them. To the contrary, in Hill v. McDonough , 547 U.S. 573, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006), the Court squarely and unanimously rejected the argument that a prisoner must "identif[y] an alternative, authorized method of execution." Id. , at 582, 126 S.Ct. 2096. The Court noted that any such requirement would "change the traditional pleading requirements for § 1983 actions," which we were not at liberty to do. Ibid. It is thus difficult to see how the "alternative-method" requirement could be "compelled by our understanding of the Constitution," ante , at 1127, even though the Constitution itself never hints at such a requirement, even though we did not apply such a requirement in more than a century of method-of-execution cases, and even though we unanimously rejected such a requirement in Hill . And while the Court in Glossip did not understand itself to be bound by Hill , see Glossip , 576 U.S., at ----, 135 S.Ct., at 2738-2739 (distinguishing Hill on the theory that Hill merely rejected a heightened pleading requirement for § 1983 suits), the two decisions remain in considerable tension. Confining Glossip 's "alternative method" requirement to facial challenges would help to reconcile them.
Third , the troubling implications of today's ruling provide the best reason for declining to extend Glossip 's "alternative method" requirement. The majority acknowledges that the Eighth Amendment prohibits States from executing prisoners by " 'horrid modes of torture' " such as burning at the stake. Ante , at 1123 - 1124. But the majority's decision permits a State to execute a prisoner who suffers from a medical condition that would render his execution no less painful. Bucklew has provided evidence of a serious risk that his execution will be excruciating and grotesque. The majority holds that the State may execute him anyway. That decision *1142 confirms the warning leveled by the Glossip dissent-that the Court has converted the Eighth Amendment's "categorical prohibition into a conditional one." 576 U.S., at ----, 135 S.Ct., at 2739 (opinion of SOTOMAYOR, J.).
B
Even assuming for argument's sake that Bucklew must bear the burden of showing the existence of a "known and available" alternative method of execution that "significantly reduces a substantial risk of severe pain," id ., at ----, 135 S.Ct., at 2737 (majority opinion) (alteration and internal quotation marks omitted), Bucklew has satisfied that burden. The record contains more than enough evidence on the point to raise genuine and material factual issues that preclude summary judgment.
Bucklew identified as an alternative method of execution the use of nitrogen hypoxia, which is a form of execution by lethal gas. Missouri law permits the use of this method of execution. See Mo. Rev. Stat. § 546.720 (2002). Three other States-Alabama, Mississippi, and Oklahoma-have specifically authorized nitrogen hypoxia as a method of execution. See ante, at 1130, n. 1. And Bucklew introduced into the record reports from Oklahoma and Louisiana indicating that nitrogen hypoxia would be simple and painless. These reports summarized the scientific literature as indicating that there is "no reported physical discom[fort] associated with inhaling pure nitrogen," App. 742, that the "onset of hypoxia is typically so subtle that it is unnoticeable to the subject," id ., at 745, and that nitrogen hypoxia would take an estimated "seventeen-to-twenty seconds" to render a subject unconscious, id., at 746-747. The Oklahoma study concluded that nitrogen hypoxia is "the most humane method" of execution available. Id., at 736. And the Louisiana study stated that the "[u]se of nitrogen as a method of execution can assure a quick and painless death of the offender."Id ., at 746.
How then can the majority conclude that Bucklew has failed to identify an alternative method of execution? The majority finds Bucklew's evidence inadequate in part because, in the majority's view, it does not show that nitrogen hypoxia will "significantly reduce" Bucklew's risk of pain as compared with lethal injection. Ante , at 1130 - 1131. But the majority does not dispute the evidence suggesting that nitrogen hypoxia would be "quick and painless" and would take effect in 20 to 30 seconds. The majority instead believes that "nothing in the record" suggests that lethal injection would take longer than nitrogen gas to take effect. Ante , at 1132. As I have already explained, the majority reaches this conclusion by overlooking considerable evidence to the contrary-such as Dr. Zivot's testimony that Bucklew's pain would likely prove "prolonged," App. 234, that lethal injection would not "result in 'rapid unconsciousness,' " id ., at 233, and that from the time of injection to "Mr. Bucklew's death several minutes to as long as many minutes later, Mr. Bucklew would be highly likely to experience ... the excruciating pain of prolonged suffocation," id ., at 222. In discounting this evidence, the majority simply fails "to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Tolan , 572 U.S. at 651, 134 S.Ct. 1861 (internal quotation marks and alteration omitted).
The majority additionally believes that Bucklew's evidence fails to show that nitrogen hypoxia would be easy to implement. Ante , at 1129. But the reports from Oklahoma and Louisiana tell a different story. The Louisiana report states that *1143 nitrogen hypoxia would be "simple to administer." App. 737. The Oklahoma report similarly concludes that "[d]eath sentences carried out by nitrogen inhalation would be simple to administer." Id ., at 746; see also id., at 696. The reports explain that nitrogen hypoxia would "not require the use of a complex medical procedure or pharmaceutical products," id ., at 747, would "not require the assistance of licensed medical professionals," id ., 736, and would require only materials that are "readily available for purchase," id. , at 739. Further, "[b]ecause the protocol involved in nitrogen induced hypoxia is so simple, mistakes are unlikely to occur." Id. , at 748. And both studies recommend the development of protocols for actual implementation. See id. , at 697 (Oklahoma report recommending development of "a nitrogen hypoxia protocol"); id. , at 736 (Louisiana report noting that although "the exact protocol" has not been finalized, the report recommends "that hypoxia induced by the inhalation of nitrogen be considered for adoption"); see also Murphy, Oklahoma Says It Plans To Use Nitrogen for Executions, USA Today, Mar. 15, 2018 (quoting the Oklahoma attorney general's statement that nitrogen "will be effective, simple to administer, easy to obtain and requires no complex medical procedures"); but cf. ante , at 1129.
Presented with evidence such as Bucklew's, I believe a State should take at least minimal steps to determine the feasibility of the proposed alternative. The responsible state official in this case, however, acknowledged that he "did not conduct research concerning the feasibility of lethal gas as a method of execution in Missouri." Id. , at 713; see also Record in No. 14-800 (WD Mo.), Doc. 182-6, p. 16 (different official acknowledging that, "to be candid, no, I did not go out and try to find answers to those questions").
The majority sensibly recognizes that an inmate seeking to identify an alternative method of execution "is not limited to choosing among those presently authorized by a particular State's law." Ante , at 1128. But the majority faults Bucklew for failing to provide guidance about the administration of nitrogen hypoxia down to the last detail. The majority believes that Bucklew failed to present evidence "on essential questions" such as whether the nitrogen should be administered "using a gas chamber, a tent, a hood, [or] a mask"; or "in what concentration (pure nitrogen or some mixture of gases)" it should be administered; or even how the State might "protec[t the execution team] against the risk of gas leaks." Ante, at 1129.
Perhaps Bucklew did not provide these details. But Glossip did not refer to any of these requirements; today's majority invents them. And to insist upon them is to create what, in a case like this one, would amount to an insurmountable hurdle for prisoners like Bucklew. That hurdle, I fear, could permit States to execute even those who will endure the most serious pain and suffering, irrespective of how exceptional their case and irrespective of how thoroughly they prove it. I cannot reconcile the majority's decision with a constitutional Amendment that forbids all "cruel and unusual punishments." Amdt. 8.
C
Justice THOMAS concurs in the majority's imposition of an "alternative method" requirement, but would also permit Bucklew's execution on the theory that a method of execution violates the Eighth Amendment " 'only if it is deliberately designed to inflict pain.' " Ante , at 1135 (concurring opinion) (quoting Baze , 553 U.S. at 94, 128 S.Ct. 1520 (THOMAS, J., concurring in judgment)). But that is not the proper standard.
*1144 For one thing, Justice THOMAS' view would make the constitutionality of a particular execution turn on the intent of the person inflicting it. But it is not correct that concededly torturous methods of execution such as burning alive are impermissible when imposed to inflict pain but not when imposed for a subjectively different purpose. To the prisoner who faces the prospect of a torturous execution, the intent of the person inflicting the punishment makes no difference.
For another thing, we have repeatedly held that the Eighth Amendment is not a static prohibition that proscribes the same things that it proscribed in the 18th century. Rather, it forbids punishments that would be considered cruel and unusual today. The Amendment prohibits "unnecessary suffering" in the infliction of punishment, which this Court has understood to prohibit punishments that are "grossly disproportionate to the severity of the crime" as well as punishments that do not serve any "penological purpose." Estelle v. Gamble , 429 U.S. 97, 103, and n. 7, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Constitution prohibits gruesome punishments even though they may have been common at the time of the founding. Few would dispute, for example, the unconstitutionality of "a new law providing public lashing, or branding of the right hand, as punishment ... [e]ven if it could be demonstrated unequivocally that these were not cruel and unusual measures in 1791." Scalia, Originalism: The Lesser Evil, 57 U. Cin. L. Rev. 849, 861 (1989). The question is not, as Justice THOMAS maintains, whether a punishment is deliberately inflicted to cause unnecessary pain, but rather whether we would today consider the punishment to cause excessive suffering.
III
Implicitly at the beginning of its opinion and explicitly at the end, the majority invokes the long delays that now typically occur between the time an offender is sentenced to death and his execution. Bucklew was arrested for the crime that led to his death sentence more than 20 years ago. And Bucklew's case is not an anomaly. The average time between sentencing and execution approaches 18 years and in some instances rises to more than 40 years. See Glossip , 576 U.S., at ----, 135 S.Ct., at 2764 (BREYER, J., dissenting); Reynolds v. Florida , 586 U.S. ----, ----, 139 S.Ct. 27, 28, 202 L.Ed.2d 389 (2018) (BREYER, J., statement respecting denial of certiorari).
I agree with the majority that these delays are excessive. Undue delays in death penalty cases frustrate the interests of the State and of surviving victims, who have "an important interest" in seeing justice done quickly. Hill , 547 U.S. at 584, 126 S.Ct. 2096. Delays also exacerbate the suffering that accompanies an execution itself. Glossip , 576 U.S., at ---- - ----, 135 S.Ct., at 2764-2767 (BREYER, J., dissenting). Delays can "aggravate the cruelty of capital punishment" by subjecting the offender to years in solitary confinement, and delays also "undermine [capital punishment's] jurisprudential rationale" by reducing its deterrent effect and retributive value. Id., at ----, ----, 135 S.Ct., at 2769, 2772.
The majority responds to these delays by curtailing the constitutional guarantees afforded to prisoners like Bucklew who have been sentenced to death. By adopting elaborate new rules regarding the need to show an alternative method of execution, the majority places unwarranted obstacles in the path of prisoners who assert that an execution would subject them to cruel and unusual punishment. These obstacles in turn give rise to an unacceptable risk that Bucklew, or others in yet more difficult *1145 circumstances, may be executed in violation of the Eighth Amendment. Given the rarity with which cases like this one will arise, an unfortunate irony of today's decision is that the majority's new rules are not even likely to improve the problems of delay at which they are directed.
In support of the need to end delays in capital cases, the majority refers to Dunn v. Ray , 586 U.S. ----, 139 S.Ct. 661, --- L.Ed.2d ---- (2019). In that case, the Court vacated a stay of execution on the ground that the prisoner brought his claim too late. The prisoner in that case, however, brought his claim only five days after he was notified of the policy he sought to challenge. See id., at ----, 139 S.Ct., at 662 (KAGAN, J., dissenting). And in the view of some of us, the prisoner's claim-that prisoners of some faiths were entitled to have a minister present at their executions while prisoners of other faiths were not-raised a serious constitutional question. See id. , at ----, 139 S.Ct., at 661 (characterizing the Court's decision as "profoundly wrong"). And therein lies the problem. It might be possible to end delays by limiting constitutional protections for prisoners on death row. But to do so would require us to pay too high a constitutional price.
Today's majority appears to believe that because "[t]he Constitution allows capital punishment," ante , at 1122, the Constitution must allow capital punishment to occur quickly. In reaching that conclusion the majority echoes an argument expressed by the Court in Glossip , namely, that "because it is settled that capital punishment is constitutional, it necessarily follows that there must be a constitutional means of carrying it out." 576 U.S., at ----, 135 S.Ct., at 2732-2733 (emphasis added; alterations and internal quotation marks omitted).
These conclusions do not follow. It may be that there is no way to execute a prisoner quickly while affording him the protections that our Constitution guarantees to those who have been singled out for our law's most severe sanction. And it may be that, as our Nation comes to place ever greater importance upon ensuring that we accurately identify, through procedurally fair methods, those who may lawfully be put to death, there simply is no constitutional way to implement the death penalty.
I have elsewhere written about these problems. See id ., at ---- - ----, 135 S.Ct., at 2770-2773 (BREYER, J., dissenting). And I simply conclude here that the law entitles Bucklew to an opportunity to prove his claim at trial. I note, however, that this case adds to the mounting evidence that we can either have a death penalty that avoids excessive delays and "arguably serves legitimate penological purposes," or we can have a death penalty that "seeks reliability and fairness in the death penalty's application" and avoids the infliction of cruel and unusual punishments. Id. , at ----, 135 S.Ct., at 2772. It may well be that we "cannot have both." Ibid.
* * *
I respectfully dissent.